STATE *v.* WOODRUFF *et al.*

(In Banc. Oct. 30, 1933. Suggestion of Error Overruled Jan. 1, 1934.)

[150 So. 760. No. 29601.]

Lamar F. Easterling, of Jackson, special counsel for appellant, the state of Mississippi.

**L. F. Easterling** and **R. H. Thompson,** both of Jackson, for appellants, Delta Development Company, W. F. Swan and Mary Swan.

750

**Green, Green & Jackson,** of Jackson, for appellees and cross-appellants, Holders and Owners of No. 1 Levee Bonds and Coupons.

754

758

**Flowers, Brown & Hester,** of Jackson, for appellee, Delta & Pine Land Company.

May, Sanders, McLaurin & Byrd, of Jackson, and Chas. N. Burch and H. D. Minor, both of Memphis, Tennessee, for Yazoo & Mississippi Valley Railroad Company.

Argued orally by **L. F. Easterling**, for appellant, and by **Marcellus Green**, for appellees; by **J. T. Brown**, for Delta & Pine Land Company, and by **J. O. S. Sanders**, for Y. & M. V. R. R.

**Griffith, J.**, delivered the opinion of the court.

This suit was begun by a bill filed in the chancery court of Hinds county on August 18, 1888. On February 21, 1931, forty-three years thereafter, an interlocutory decree was rendered and an appeal was allowed to settle the principles of the case. At the March, 1899 term, this court, in response to a similar appeal in this case, delivered an opinion, reported in Woodruff v. State, 77 Miss. 68, 25 So. 483, which substantially covered the merits so far as the law is concerned, and it seems to us that

the appeal now allowed, thirty-two years thereafter, is for a construction by this court as now constituted of the opinion then delivered.

When a case on an interlocutory appeal has once been before this court, and the court has attempted to deal with the controlling principles in the case, it is not permissible to grant another interlocutory appeal to construe the former opinion, more especially after the lapse of long years, and this is true even when, as here, the former opinion is involved in obscurity or is difficult of exact interpretation. There must be an end to appeals. What was said by the court in this case on this subject in 83 Miss., page 110, 35 So. 422, is not the rule now and has not been since the amendment made in 1924 to the statute, and which appears as section 14, Code 1930. But the stated ground upon which an interlocutory appeal is granted is not controlling, Yazoo & M. V. R. Co. v. James, 108 Miss. 656, 67 So. 152, and this court may entertain it upon other grounds apparent from the record. Two of these grounds are, ''to avoid expense and delay,'' and because the decree, which we have decided upon, will do both in this case, we have accepted jurisdiction, and will proceed to a determination which will put this ancient litigation to an end so far as this court and the trial court are concerned.

The case came back also to the court at the October, 1903 term, on the question whether the state was subject to suit in the case, and the opinion is reported in State v. Woodruff, 83 Miss. 111, 36 So. 79, 37 So. 706. These reports give sufficient of the facts to form a general statement of what is now before us, and we will not here repeat them. And we consider that the law of the case as found in those opinions is binding upon us here, although those opinions were delivered by special judges appointed in the case in the place of judges of the court disqualified; but we think it our duty to add that we so definitely disapprove of the decision in 83 Miss., holding the state liable to suit in this case, that we hereby expressly over-

rule that opinion and decision on that point as to all future cases. We hold that the state cannot be made liable to suit out of implications gathered from a statute or any group of statutes, but the right to sue the state must be expressly granted by statute, without which express grant no allowance to sue the state exists.

. The lands which are spoken of as being involved in this litigation are among those in six counties of the Delta lying north of a line projected eastward from the southwest corner of Bolivar county—hundreds of thousands of acres. Neither by the original bill nor by any amendment thereof was any individual liability sought to be imposed upon any owner or owners of any of the lands; nor could there be, for none of the many legislative acts relied on ever attempted to impose any such liability on any owner. There was never against an owner any liability in personam. But the contention was and is that the lands are liable or chargeable in rem and it is sought to enforce the amounts for which the several parcels are charged to be liable by having a commissioner appointed by the said chancery court to sell all these thousands of acres and thereby to make the money to pay complainants. So far as the lands are concerned, the suit is to enforce a charge in rem upon them.

There are occasional sentences or parts of sentences in the opinion in 77 Miss. which speak in general terms of the liability of the land for the No. 1 levee assessments as if it might be meant to hold that these lands could be reached herein by the complainant bondholders, that the assessments or charges imposed by the No. 1 levee act could be enforced by these complainants directly against these lands in the present suit. We have been in much difficulty in the effort to construe the exact meaning of the opinion in 77 Miss. as to what it intended to hold in respect to the liability, if any, of the lands directly to these bondholders. In numerous conferences and otherwise, through many tedious hours, the members of the court have earnestly striven to reach some certain con-

clusion upon the construction of that opinion, but without entire success. The difficulty is that in that opinion the court separately treated of the several elements which entered into the problem and clearly analyzed and announced in plain and definite language its holdings on the said several component elements, and then in combining those elements into the whole, or in attempting to outline the effect of each of the said separate elements in relation to the entire of the problem before the court, such general language was used that it is impossible to determine with entire confidence what was meant by the general terms employed.

In that dilemma we have determined to resort for aid by borrowing from the principle which is available in the construction of statutes, which principle is that when there is in a statute a particular enactment in plain and definite terms, the particular enactment will prevail over general language contained in the same statute; and we also bring to our aid those fundamental and thoroughly established principles of law in the full view of which we must assume the said opinion was written.

Let us view the general language, above mentioned, touching the liability of the lands directly to these complainants, first, as regards the large number of owners of these lands who were attempted to be made parties defendant to this suit by designating them not by name but by a general description or sweeping inclusion. After naming several defendants, hereafter to be mentioned, the bill continued in its introduction in regard to those made defendants, as follows: "And all persons claiming to own lands within the bounds" of the No. 1 Levee District, "and who are too numerous to be made defendants individually, and to be served with process herein."

The court in 77 Miss. made no mention of the abortive manner in which the parties so generally designated were attempted to be brought in as defendants. Certainly, however, the court could not have overlooked fundamental principles and could not have intended by any general

language used by it to hold that the numerous owners, attempted to be made defendants by any such designation or description and without process on them, were in anywise effectively before the court, or that their separate lands, separately owned in numerous separate tracts, could in the slightest be affected by this suit.

In a suit concerning a tract or parcel of land, any and all persons holding legal or equitable interests therein of a substantial nature, and which interests would be materially impaired or otherwise adversely affected to a substantial extent by the granting of the relief sought against the land, must be made parties defendant. This rule is imbedded in fundamental right and is of imperative obligation, and when such a party is not actually made a defendant and given notice, any decree made against the land and in impairment of the said holder's interest therein is void as to him and his land as being without due process of law. And this rule is not, and cannot be, avoided by the fact that numerous separate owners of separate parcels or tracts own or hold by the same or similar titles however numerous those owners may be.

The numerous parties rule as to necessary parties defendant has only a limited operation and obviously so; and this is particularly true as to suits concerning lands. Trustees of express trusts and those within the force of a similar reason, may sometimes be allowed as defendants in the place of the numerous necessary parties whom they represent; but there is no such case here as to these so-called numerous defendants nor anything which may be substantially likened thereto. Nor are they averred to be unknown defendants, unknown after diligent search and inquiry, for the bringing in of whom, as defendants, summons may be served by publication. And even if they were sought to be brought in as unknown, there is no sufficient sworn averment to form the necessary basis for publication, for which reason any publication, if it had been made, would be absolutely void. These so-called

numerous defendants are not, and never have been, before the court; there is, therefore, no jurisdiction of the lands owned by them, no valid decree could be made herein against them or their lands, and as to them and their lands the bill must be dismissed and the court in writing in 77 Miss. must have known that this would have to be done, from which it follows that the general language referred to must necessarily not have been intended to declare any direct liability of the lands of these numerous separate owners of separate tracts, that is to say, direct liability to these complainant bondholders in this suit.

And, second, the same result, so far as this suit is concerned, must follow as to the lands of the railroad company, of the two land companies, and of all the other defendants of which there were a few, named as defendants in the bill and who were served with process or have entered their appearance and have answered. The title by which these named defendants hold was dealt with particularly in the opinion in 77 Miss., and by the cases to which the opinion in 77 Miss. makes reference with approval; and the effect of the opinion in its particular treatment of the title and lands of the said named defendants is that those lands cannot be reached by these complainants in this suit, and for the following reasons: The title of the named defendants came through the decree in Gibbs v. Green, 54 Miss. 592, and became vested in them or their predecessors on the date of the confirmation of the sale made under that decree, which confirmation was in March, 1882. Previous to that confirmation, all the lands covered therein were held by the liquidating levee board and were not, while so held, subject to the No. 1 levee taxes, and therefore, were not assessable for complainants' bonds. Upon the confirmation of the sale, the lands did then at once become assessable for the 1882 No. 1 levee taxes—1882 being the last year for which said No. 1 levee assessments could be made. The railroad company paid all the 1882 assessments on its lands except in

one county. It is not shown whether the other named defendants paid any of their 1882 No. 1 levee assessments, and for the purposes of this case we will assume that they did not.

By section 10 of the Act of March 17, 1871, under which complainants' bonds were issued, two statutory remedies were provided by which the bondholders could directly enforce the assessment and collection of the assessment from and against the lands by direct proceedings in the name of the bondholders, these remedies being mentioned at page 109 of 77 Miss., 25 So. 483, 486. These statutory remedies were required to be pursued in the matter of jurisdictional venue where the lands are located. In accordance with long settled principles of law, these remedies were exclusive so far as concerned any direct procedure or remedy by the bondholders against the lands. They took the bonds under a statute which expressly provided those remedies in behalf of the bondholders, so far as concerned any direct proceedings by them against the lands, and having taken them in full view of the statute and all its provisions, it is but just that these bondholders must be referred for any direct proceedings against the lands to those statutory remedies, and that in the respect mentioned they shall be, as said, exclusive. These statutory remedies, as pointed out by the court in 77 Miss. top page 110, 25 So. 483, 486, were never effectively repealed and were in available force in 1882 and until the right to resort thereto was barred by the statutes of limitation which have now run and the bar has become complete. This suit in Hinds county is not the character of suit authorized by the said statute either as to its substance or as to territorial venue, and has had no effect either as an admissible remedy by the complainant bondholders directly against the lands or to keep the statute of limitations from running in respect to the remedy directly against the lands. The bill must therefore be dismissed as to all the lands and as to all the owners of the lands, past or present.

This brings us to the liability of the state. There is no question but that the former opinion and decision held the state liable as trustee for all moneys actually collected or received by the state for the account of the No. 1 levee bonds. Counsel for the state have admitted in the argument at the bar that the state is liable for the sum of twenty-one thousand eight hundred fifty-one dollars and seventy-three cents, which it was said was actually received by the state, but this admission was on the condition that that sum should be allowed without interest, and the only argument here upon the sum mentioned is whether interest should be added. Inasmuch as the state cannot be bound absolutely by consent of its counsel as to any monetary judgment to be entered against the state, we have looked into the matter of how the aggregate of twenty-one thousand eight hundred fifty-one dollars and seventy-three cents was made up or calculated, and in so doing we have been put in some doubt whether the entire of the principal of said sum of twenty-one thousand eight hundred fifty-one dollars and seventy-three cents is recoverable by complainants; but when interest is calculated on some of the amounts which the state is unquestionably due to pay, and has been for years, and this interest is added to the principal of those amounts, the said sum of twenty-one thousand eight hundred fifty-one dollars and seventy-three cents is substantially approached in the aggregate, and we shall therefore allow the admitted amount of twenty-one thousand eight hundred fifty-one dollars and seventy-three cents to stand, but without interest on that aggregate. There is no difficulty about the twenty-one thousand eight hundred fifty-one dollars and seventy-three cents, and we pass at once to the question whether the state is liable for the amounts not collected or received by the state, but which should have been collected.

The principal of the bonds held by complainants, and not barred on August 18, 1888, amounts to one hundred forty-seven thousand seven hundred dollars. Adding the

interest at six per cent since their respective maturities, the total principal and interest would amount to more than one-half million dollars. It is said that the state must be held liable for this enormous amount, over and above the twenty-one thousand eight hundred fifty-one dollars and seventy-three cents already mentioned, because the state sold the lands sought to be brought herein, without collecting the district No. 1 levee assessments due thereon, that the state had at one time or another these levee lands in its possession or control, and was charged with the trust to collect out of them the assessments aforesaid, but that the various officers acting for the state allowed the lands to pass from the state into the ownership of individuals without making the collections; that the state has disposed of the property out of which it was the duty of the state as trustee to make the trust funds; and that although in so doing the state actually collected none of the levee assessments except as to the twenty-one thousand eight hundred fifty-one dollars and seventy-three cents, it is nevertheless liable therefor upon the same principle applicable to an individual trustee who has negligently or deliberately allowed the property out of which the trust interest was to be produced, to get out of his possession or control.

Whether it was the intention of the court in 77 Miss. to hold with the contention that the state is unconditionally liable, for all the No. 1 levee assessments which should have been but were not collected, we are unable to determine with certainty from the said opinion. It may be that there was in the minds of the court that the state, by a cross-bill against its codefendants in this suit, could compel against the lands in the hands of the then owners the payment of the uncollected assessments, and thereby save itself of the effects of an absolute decree in this suit. If that was not what the court had in mind, then certainly it must have intended to hold that the state would have the right to take some appropriate action against the lands and thereby relieve itself of loss

on account of its trusteeship. These suggestions would serve to account for, and to reconcile, to a large extent, the general language used in the opinion about the liability of the lands for the uncollected assessments; and the trial court took that view. But, being in uncertainty what exactly the court meant to hold with reference to the liability of the state for the uncollected assessments, we shall assume for the purposes of the further consideration of the state's liability for said uncollected assessments, that the court did intend to hold the state liable therefor, with the right of the state to proceed against the lands to enforce the said assessments, and that if that holding had been promptly followed up by complainants, a decree would have been thereafter entered against the state in complainants' behalf for all said assessments which the officers of the state should have collected, but did not collect. That was years ago. At that time the state, having paid the demand, could have pursued the lands and all the several then owners thereof and by proper proceedings against the lands could have recovered out of those lands a large part, at least, of the amounts that ought to have been previously collected from them for these levee assessments, and thus the state could, to a considerable extent, have reimbursed itself and restored to its treasury the large sum that it was required to pay to complainants.

But a generation has passed; and what is the situation now? If the state is now required to pay the staggering sum mentioned and should attempt to recover it from the lands in the hands of the present owners, the state would be met by the owners with the defense of laches or staleness, and from such a defense there would be no escape even by the state; for there the state would not be suing as a sovereign to enforce or protect a public or governmental right; but because of its occupancy of the position of a pecuniary trustee, the suits would be on account of the pecuniary obligations incurred as such trustee to private parties, in which case the defenses of laches and

staleness may be interposed against the state as effectively as against an individual complainant.

The last assessment due on these lands, applicable to complainants' bonds, was that for the year 1882—fifty years ago. By section 8 of the Act of March 17, 1871, the charge placed on the land for the levee purposes therein mentioned, and to secure the bonds sued on in this case, amounted to an annual charge of ten cents per acre on unimproved land, or one dollar and twenty cents per acre for the twelve-year period therein fixed, and sixty cents per acre annually on improved or cultivated land, or seven dollars and twenty cents per acre for the twelve-year period. And yet for years thereafter, large bodies of this and similar land were sold for six and eight cents per acre, and the state regularly sold its own land of the same character, title to which it had received direct from the general government, as well as that which it held as forfeited for ad valorem taxes, at twenty-five cents per acre. If it had not done so, the general settlement and development of that section would have been retarded for years. Small wonder, therefore, that the state did not undertake the stagnating process of attempting to collect the large and unreasonable charges placed on this land by the mischievous piece of legislation passed as aforesaid in 1871, and which was typical of much other of the same general character enacted in those dark and unhappy days.

The state proceeded to place these lands, and all of them, in the hands of private owners at the best reasonable price it could get, so that the large territory so vitally affected could be reclaimed and put to cultivation and improvement, and the result of this policy has been that what was then to a large extent a dismal expanse, covered with brakes and matted underbrush, abounding in bogs and sloughs, and pervaded with miasma and malaria, has now, by industry and determined endurance, been converted into a broad region of highly developed farms, with roads, schoolhouses, and churches. Those

who reclaimed this land from the wilderness and swamp have nearly all passed away, and their children and grandchildren remain in their place. Thousands of acres have been sold and transferred one to another by warranty after warranty; mortgages and deeds of trust constituting the chief basis of the credit structure of that vast agricultural section have been issued in numbers and amounts beyond the possibility of total estimation; bonds for public improvements have been issued; towns and villages follow upon each other every few miles. And these are the lands against which the state would have to go to recover the levee assessments now fifty years old, and of which none of these people have ever even heard, assessments which in aggregate amount, not including interest, is more than the great majority of the land was worth when the settler first went upon it, and which even now when the more than fifty years' interest is added, would equal in many cases the present value of the land even in its improved condition. There are other elements, such as the loss of records, the death of all witnesses who would know of the long forgotten facts, the impossibility of recoupment on warranties, the loss of valuable securities, the destruction of credit and of confidence in titles, these are some of the things; so that the statement, without more, of such an intolerable proposition, demonstrates that the state would not now, at this late and impossible day, be permitted to recover a penny against these lands for the account of these antiquated bonds. The delay has been utterly too long.

And because the delay to bring this cause to a final determination precludes the state from any recoupment if it should be now required to pay the enormous sum demanded, the question inevitably arises, whether the complainants who were direct actors in the delay that has ensued should be allowed to prevail, and thereby leave the entire loss on the state, or whether instead thereof the doctrine of laches or staleness should be applied in

the present case, and recovery, except as to the admitted sum, be denied on that ground.

The doctrine of laches or staleness, which is constantly growing in favor among the courts of this country, is well established and clearly recognized in this state. It was applied, and some of the leading authorities on the subject were reviewed in Comans v. Tapley, 101 Miss. 203, 57 So. 567, Ann. Cas. 1914B, 307; and as disclosed by that case, it has its operation not only as to delay in instituting the suit, but also in the failure thereafter to bring the case to a final determination. The institution of a suit does not prevent the operation of the rule of laches; the failure to prosecute to a conclusion within such time as reasonable diligence could and would have accomplished an end of the litigation will have the same effect as if no suit had ever been brought. 21 C. J., pp. 217, 218.

No precise definition of laches or staleness is possible to prescribe, nor may any brief resume be made which will embrace all the considerations which are to be taken into view in the application of the rule; all the authorities agree that each case is to be determined according to its own particular circumstances. An approximation is found, however, in the general statement that when such great delay has transpired, that the conditions and circumstances surrounding the defendants and those whose interests would be inevitably affected, have become so changed as to seriously impair such advantages as they might have had, or will subject them to hardships that would have been avoided, if the cause had been seasonably brought to a conclusion, the court will not interfere to give relief. 4 Pomeroy Eq. Jur., secs. 1440-1457; 21 C. J., pp. 210-258; Comans v. Tapley, supra.

The language both of the opinions and the texts often contain references to negligence as an element in laches or staleness. This, however, is because usually negligence is what caused the delay, but the rule and the equitable policy involved therein are concerned not so much with

the cause of the delay as with the fact that it has happened, and with the results that the delay has produced. And in applying the rule of laches and staleness in this case, as we have determined it is our duty to do, we prefer no charge of negligence against any of those who now or in the past have been concerned in it, either as litigants or counsel. Nevertheless the delay, intolerable in the extent thereof, is undeniable, and the disadvantageous results thereof have already been in part mentioned. For instance, after the cause was finally got to issue, it was referred to a master, and he made a partial report in 1910. Nothing further appears from the master until 1927, when another partial report was made by another master. It is shown that the first master died, and, seventeen years elapsed before anything like a final report was made. It was not until two years thereafter, in 1929, that the second master was able to respond to the exceptions filed to his report, and in his said response we note that he stated that there were in the case some further references to be made to him as master, "if he should so long live."

It may be, and we think it probable, that what has had more to do with the delays of this case than anything else has been the many changes of personnel in the attorney-general's office in the more than forty years since this litigation was instituted, and that because of the almost unlimited range of facts and of the enormous volume of the records that have been involved, that office has asked and has received undue indulgence from complainants in regard to the various steps in the progress of the cause; but the state is not to be bound by that course of conduct, and this for the same reason which makes it immaterial that the state has not expressly raised the defense of laches and staleness at any stage of this case, although its counsel have insisted upon it after the point was raised by this court.

The reason why the state is not bound in the matter aforesaid by the indulgences extended to its counsel, and

at the same time the reason why it has become the duty of the court to raise the point aforesaid, is, of course, that when an officer or attorney appears, representing the state or a county in litigation, he must actually take care of the public interests involved therein, and which he undertakes to serve, and if he does not and this becomes apparent to the court, the duty of the court then is to intervene and see to it that in some appropriate and effective way the public interests are protected. This principle was affirmed and pronounced in strong terms in Robertson v. Bank, 116 Miss. 501, 508, 77 So. 318. This has always been the law; every person dealing with officers and attorneys for the state is charged with knowledge of it, and the force and extent of its operation; the principle would seem to be obvious, and we, therefore, do not enter upon any prolonged discussion of it, except to add one final observation: Although the duty of courts in respect to the progress of suits wherein the state or county is a party is as above stated, nevertheless it is urged that this court is powerless here to take the course which that duty directs in regard to the question of laches even where the state is a party, as here, because that question was not expressly raised in the lower court. True, that question must ordinarily be raised in or by the lower court, and certainly so if the laches apparent upon the record be deniable or explainable. But here we have a case over forty years in court, nearly twenty years in the hands of masters and no entirely complete report or decree yet made. The matter speaks for itself, we need no formal introduction to it by the lower court, —the laches is incontrovertible upon that which is equivalent to judicial knowledge, whatever the lower court may have held upon it had the point been expressly raised therein. It has too long been the settled rule in this state to permit any question now upon it, that when a record brought before us introduces a fatal infirmity, and that infirmity plainly cannot be obviated were opportunity given to an attempt to do so, this court must act upon

that infirmity although not raised or noticed in the trial court. Wilson v. Railroad, 77 Miss. 714, 720, 28 So. 567, 52 L. R. A. 357, 78 Am. St. Rep. 543; Gabbert v. Wallace, 66 Miss. 618, 620, 5 So. 394; Burke v. Shaw, 59 Miss. 443, 447, 42 Am. Rep. 370.

A judgment or decree against the state for the payment of money, although entered by its highest court, is not enforceable except by a legislative appropriation. If the case is clear, and there is no available defense to the liability, the court should enter the judgment, although it may be that at the time being it will meet with legislative disobedience. But in order to render such disobedience inexcusable, and therefore improbable, any such judgment should go to the legislature as an unreserved and solemn recommendation by the court that the liability is fair and free from serious doubt, and that there are no valid defenses known to the law or recognized in equity which the court has failed to discern and to apply. If this were not the course of conduct to be pursued by the court in rendering money judgments against the state, it had as well not render them at all.

We are authorized and directed by ETHRIDGE, P. J., to say that he concurs in all of the foregoing opinion except the paragraph which holds the state liable for the twenty-one thousand eight hundred fifty-one dollars and seventy-three cents therein mentioned; and by ANDERSON, J., and SMITH, C. J., that they concur in that particular paragraph and in the holding thereof. The result is that the entire of the opinion, and the judgment directed to be entered, have the concurrence of the majority of the court.

The decree of the chancery court is in part affirmed and in part reversed, and the cause is remanded with directions to enter a final decree in complainants' favor against the state for the sum of twenty-one thousand eight hundred fifty-one dollars and seventy-three cents, and to dismiss the bills as to all other relief. The chan-

cery court will make such adjudication in the matter of costs as may seem to the court equitable and just.

Affirmed in part, reversed in part, and remanded with directions.

**Smith, C. J.,** delivered an opinion dissenting in part.

On a former appeal in this case, reported in 77 Miss. 68, 25 So. 483, this court settled all of its controlling principles, and in 81 Miss. at page 458, 33 So. 78, 79, another appeal herein, said: ''The principles of law therein announced [referring to its former opinion] must govern the parties litigant and the lower court in the further progress of this cause.'' The court there held: First, that the appellees could not in this proceeding collect the levee taxes due and unpaid on the lands here in question subject thereto for the payment of the bonds sued on as such and in the manner originally contemplated by the statutes imposing the taxes, but could enforce the trust assumed by the state when it abolished the levee boards, took over the title to the lands, and agreed to collect the taxes due thereon when it should sell the lands; second, that the state held the lands, under the statutes there referred to, in trust charged with the duty of collecting the levee taxes due thereon and of applying the taxes when collected to the payment of the bonds here sued on, these taxes, under the statutes, to be included in the consideration paid by the purchasers of the lands when sold by the state; third, that the state must disclose the lands remaining in its hands unsold; fourth, that the state must disclose and pay to the appellees the money it actually collected as levee taxes due on any of the lands here in question sold by it; and fifth, that the purchasers of any of the lands here in question from the state, who failed to then pay to the state the levee taxes due thereon, received the land charged with the payment thereof, which charge or lien thereon could be enforced in this proceeding. This is but the application of the ordinary

rule governing the execution of a trust, to-wit, that where a trustee disposes of property in violation of the trust, the persons receiving the property with knowledge thereof take it subject to the trust.

The court did not there hold the state liable for any taxes it should have collected, but failed to, when it sold the lands. To have held the state liable therefor would have violated the practically universal rule that the state is not liable in damages to a private individual for derelictions of duty by its officers.

On the return of the case to the court below a master was appointed to ascertain and report what decree the court should render. This master made a partial report and another was thereafter appointed, who also made a report, and the two reports, in substance, advised the court: First, that the state was charged with the duty of administering the trust assumed by it as hereinbefore outlined and must account to the complainant, appellant here, for (a) lands here involved and which it had not sold; (b) the taxes collected by it on any of the lands which it had sold; (c) any taxes which it failed to collect on any lands sold by it; and second, that while the lands sold by the state without the collection of the taxes here in question due thereon remained liable therefor, such taxes or charges on the lands could not be collected for the benefit of the complainant in this proceeding but only by the state itself in a proper proceeding therefor.

Objections to these reports were overruled by the court and the reports confirmed, and both an appeal and a cross-appeal were granted to again settle the principles of the case.

The sole question presented by this record is whether or not the court erred in approving the masters' reports.

When the masters' reports are compared with the opinion herein on the former appeal, it will appear, as hereinbefore outlined, that they are not in conformity thereto in two particulars: First, in holding the state liable for the taxes it should have collected but did not on the lands

here in question sold by it, and second, in holding that the taxes remaining unpaid on the lands sold by the state could not be enforced in this proceeding as a charge on the lands.

In passing I will say that whether the state itself can proceed against the lands which it sold without collecting the taxes here in question due thereon, and charge the lands therewith in another proceeding, is not now before the court. That question can be presented only when the state institutes such a proceeding with the proper parties thereto.

The question of laches in the court below on the part of the complainant was not presented to or passed on by the lower court, and was not raised by counsel in this court but by this court of its own motion. This court is one of appellate jurisdiction only and should try cases appealed to it on the record made in the court below and should review only the rulings there made. If the court below had of its own motion, or on request of a party defendant hereto, applied or refused to apply the doctrine of laches, then this court would have been presented with the question. But aside from that, the question of laches should not be raised by this court of its own motion, or be permitted to be here raised by counsel, for the reason that it is without any evidence that would enable it to say whether or not the delay in the prosecution of the case was either culpable or has resulted in undue hardships to any of the parties hereto. On the return of the case to the court below the court, before applying the doctrine of laches, should hear any evidence the parties may desire to present as to the cause of the delay in the prosecution of the case and as to any hardships that may have resulted therefrom, so that it may determine whether the complainant was at fault in not prosecuting the case with due diligence. Wailes v. Johnson and Cooper, 25 Miss. 421; Taylor v. Wright, 54 Miss. 722; Haines v. Haines, 98 Miss. 830, 54 So. 433.

I express no opinion on the correctness vel non of the

holding of this court in State v. Woodruff, 83 Miss. 111, 36 So. 79, 37 So. 706, another former appeal herein, that the state was a proper party hereto, but accept it as the law of this case and do not concur in the overruling of that case. The special judge who wrote the opinion was a very great lawyer, one of the recognized leaders of the bar of his day, and I fail to perceive how one reading the opinion can say that its reasoning is manifestly wrong. All that can be rightfully said of it is that lawyers and judges might differ as to what conclusion the court should have then reached. The question was there fully argued by counsel, and the court here has had the benefit of no argument at all from counsel addressed thereto. I have long since learned that it is dangerous for a court to decide any but elementary questions of law without the assistance of counsel whose researches sometimes bring to light matters pertinent thereto which the court might overlook should it decide the question without such assistance.

The decree approving the reports of the masters should be reversed, and the cause remanded for further proceedings in accordance with the opinion on the former appeal.

**Ethridge, P. J.**, delivered an opinion dissenting in part.

I am of the opinion that the suit should be dismissed entirely as to the state, because the state was not at the time the suit was instituted, and is not now, subject to suit on a demand for the payment of which the legislature had not made an appropriation. It is true that this court, in a former opinion, State v. Woodruff, 83 Miss. 111, 36 So. 79, 37 So. 706, held that the state was a proper party to this suit. But as this court is an intermediate appellate court, on the question raised in this case, the decision does not constitute the law of the case, and we are not bound by it, and it should be overruled, because manifestly wrong. Louisville & N. R. Co. v. State, 107 Miss. 597, 65 So. 881. In this case the supreme court, on two former appeals, had upheld the Law of 1908 (ch. 122), divesting a foreign corporation of its right to do business

in the state if and when it removed a cause from the state court to the federal court. See 97 Miss. 35, 51 So. 918, 53 So. 454, Ann. Cas. 1912C, 1150; 104 Miss. 413, 61 So. 425.

In the decision of Louisville & N. R. Co. v. State, 107 Miss. 597, 65 So. 881, the supreme court held that although the two previous decisions had held the law to be valid, a decision of the supreme court of the United States had held to the contrary, and that the former decisions did not constitute the law of the case. The court said: "Ordinarily, the opinions heretofore rendered would constitute the law of the case, and the matters therein decided would not be again examined by us; but the law of the case rule has no application here for the reason that the right claimed by appellant is one which arises under the constitution and laws of the United States, and with reference to all such questions this court is not one of final jurisdiction, but is simply an intermediate appellate court, from whose decision an appeal lies to the supreme court of the United States, the decisions of which court, in all such matters, are binding upon and must be followed by us. Black's Law of Judicial Precedents, p. 269."

In the appeal of this case from the state court, reported in 66 Miss. 298, 6 So. 235, in the supreme court (162 U. S. 291, 16 S. Ct. 820, 40 L. Ed. 973) the ground of the attack upon the decision of the court in that report was based upon the provision of the federal constitution (art. 1, sec. 10) that the states shall pass no law impairing the obligations of contracts. The narrow point upon which the state court had decided that the bonds were void, was that they were payable in gold coins, the state court holding that there was no authority under the act to issue bonds payable in gold, or anything except lawful money of the United States. The clause of the United States constitution prohibiting states from passing laws impairing the obligations of contracts being the basis of the federal jurisdiction, it was, of course, a federal question, and the decisions of the federal court upon

that question is final, and any state decision contrary to the federal holding upon the proposition involved is only the holding of an intermediate appellate court, and we are not bound by any holding of this court involving such question. The decisions in the former appeals of this case, under which the state court held that the state was a trustee, and suable as such, because of the taking away by the legislature of the right to sue the officers charged with the administration of the law involved, are contrary to the federal decisions, and as the decisions were predicated upon an erroneous conception of the impairment of the obligations of contract clause of the federal constitution, we should not follow them. I shall proceed to show that under the federal law the state is not suable unless it consents to the suit; and will show by a Mississippi statute that there was no authority to sue when this suit was instituted, and that there has been no authority since said time.

In 59 Corpus Juris, 306, section 462, it is stated: "A state's consent to be sued is not a contract, and it can be repealed or modified at any time at the discretion of the state, even though pending suits are thereby defeated. When the consent is withdrawn the jurisdiction of the court in which the case is pending is at an end, and the suit falls to the ground." In notes to this section the author cited South & North Ala. R. Co. v. Alabama, 101 U. S. 832, 834, 25 L. Ed. 973; Beers v. Arkansas, 20 How. U. S. 527, 15 L. Ed. 991; Ex parte State, 52 Ala. 231, 23 Am. Rep. 567; McDowell v. Fuller, Warden of Michigan Reformatory at Ionia, 169 Mich. 332, 135 N. W. 265; Williamson v. Richards, 158 S. C. 534, 155 S. E. 890; State v. Murray et al., as State Dispensary Commission, 79 S. C. 316, 60 S. E. 928, affirmed Murray v. South Carolina ex rel. Ray, 213 U. S. 174, 29 S. Ct. 465, 53 L. Ed. 752.

In So. & No. Ala. R. Co. v. Alabama, supra, the state had permitted itself, by a statute, to be sued, and had authorized the auditor to draw his warrant on the treasurer to satisfy the judgment; and made it the duty of

the treasurer to pay the warrant so drawn out on the state treasury. The obligation involved in the suit accrued while this statute was in force, and while the suit was pending, the state repealed the law. The state moved to dismiss the cause, and it was dismissed by the Alabama supreme court, and appeal was taken to the supreme court of the United States, where it was contended that the state having had, when the debt was contracted, a provision by which it could be sued, and by which money could be collected to satisfy the debt, the repeal of the statute was inoperative and void so far as the demand of the plaintiff was concerned. Chief Justice WAITE, speaking for the supreme court, said:

"This case, like that of Memphis & C. R. R. Co. v. Tennessee [101 U. S. 337, 25 L. Ed. 960], supra, presents the question of the constitutionality of a law taking away the right to sue a state on its contracts. The constitution and laws bearing on the question are much the same in Alabama as in Tennessee; but in Alabama it was provided 'that if judgment should be rendered against the state, it was the duty of the comptroller, on the certificate of the clerk of the court, together with that of the judge who tried the cause, that the recovery was just, to issue his warrant for the amount, but no certificate could issue until six months after the recovery of the judgment.' Code 1867, section 2536. It was also the duty of the treasurer to pay all warrants drawn on him by the comptroller under the authority of law (Code, section 422); but the constitution, in force then and now, provided in express terms that no money should be drawn from the treasury but in consequence of appropriations made by law. Const., 1834 and 1870, art. 2, sec. 24.

"The proceedings in this case were begun while these laws were in force; but before final hearing the laws were repealed, and thereupon, on motion of the state, the suit was dismissed for want of jurisdiction. The supreme court affirmed this decision; and the question is, therefore, directly presented by this writ of error, whether

the repealing statute is valid and constitutional as against this plaintiff in error, so far as it affects the present cause of action, which accrued while the right to sue existed.

"We are unable to see any substantial difference between this case and that of R. R. Co. v. Tennessee, supra. Under both the Tennessee and Alabama statutes the courts are made little else than auditing boards. If funds are not voluntarily provided to meet the judgment, the courts are not invested with power to supply them. In Alabama, a warrant for the payment may be secured, but the state may stop payment by withholding an appropriation. Perhaps the judgment creditor may take one step further towards the collection in Alabama than he can in Tennessee; but both states may refuse to pay, that is, may refuse to make the necessary appropriation, and the courts are powerless to compel them to do so. In neither state has there been granted such a remedy for the enforcement of the contracts of the sovereignty as may not, under the constitution of the United States, be taken away."

In Beers v. Arkansas, 20 How. 527, 528, 15 L. Ed. 991, it was held that it is an established principle of jurisprudence in all civilized nations that a sovereign state cannot be sued in its own courts, or in any other, without its consent and permission; but it may waive this privilege, and permit itself to be made a defendant in a suit by individuals, or by another state. As this permission is voluntary, the sovereignty may prescribe the terms and conditions on which it consents to be sued, and the manner in which the suit shall be conducted, and may withdraw its consent whenever it may suppose that justice to the public requires it. In exercising this latter power, the state violates no contract with the parties; it merely regulates the proceedings in its own courts. That case was an action of covenant, brought in the circuit court of the state of Arkansas by Beers to recover interest due on bonds issued by the state. The suit in the state court was dismissed, and the judgment affirmed by the supreme

court of the state. Chief Justice TANEY, speaking for the court, said:

"This was an action of covenant, brought in the circuit court for Pulaski county, in the state of Arkansas, to recover the interest due on sundry bonds issued by the state, and which the state had failed to pay according to its contract.

"The constitution of the state provides, that 'the general assembly shall direct by law in what courts and in what manner suits may be commenced against the state.' And in pursuance of this provision, a law was accordingly passed; and it is admitted that the present suit was brought in the proper court, and in the manner authorized by that law.

"The suit was instituted in the circuit court on the 21st of November, 1854. And after it was brought, and while it was pending in the circuit court, the legislature passed an act, which was approved on the 7th of December, 1854, which provided, 'that in every case in which suits or any proceedings had been instituted to enforce the collection of any bond or bonds issued by the state, or the interest thereon, before any judgment or decree should be rendered, the bonds should be produced and filed in the office of the clerk, and not withdrawn until final determination of the suit or proceedings, and full payment of the bonds and all interest thereon; and might then be withdrawn, cancelled, and filed with the state treasurer, by order of the court, but not otherwise.'

. . .

"The objection taken to the validity of the act of assembly cannot be maintained. It is an act to regulate the proceedings and limit the jurisdiction of its own courts in suits where the state is a party defendant, and nothing more.

"It is an established principle of jurisprudence in all civilized nations that the sovereign cannot be sued in its own courts, or in any other, without its consent and permission; but it may, if it thinks proper, waive this priv-

ilege, and permit itself to be made a defendant in a suit by individuals, or by another state. And as this permission is altogether voluntary on the part of the sovereignty, it follows that it may prescribe the terms and conditions on which it consents to be sued, and the manner in which the suit shall be conducted, and may withdraw its consent whenever it may suppose that justice to the public requires it.

."Arkansas, by its constitution, so far waived the privilege of sovereignty as to authorize suits to be instituted against it in its own courts, and delegated to its general assembly the power of directing in what courts, and in what manner, the suit might be commenced. And if the law of 1854 had been passed before the suit was instituted, we do not understand that any objection would have been made to it. The objection is, that it was passed after this suit was instituted, and contained regulations with which the plaintiff could not conveniently comply. But the prior law was not a contract. It was an ordinary act of legislation, prescribing the conditions upon which the state consented to waive the privilege of sovereignty. It contained no stipulation that these regulations should not be modified afterwards, if, upon experience, it was found that further provisions were necessary to protect the public interest; and no such contract can be implied from the law, nor can this court inquire whether the law operated hardly or unjustly upon the parties whose suits were then pending. That was a question for the consideration of the legislature. They might have repealed the prior law altogether, and put an end to the jurisdiction of their courts in suits against the state, if they had thought proper to do so, or prescribe new conditions upon which the suits might still be allowed to proceed. In exercising this latter power, the state violated no contract with the parties; it merely regulated the proceedings in its own courts, and limited the jurisdiction it had before .conferred in suits when the state consented to be a party defendant.

"Nor has the state court, in the judgment brought here for review, decided anything but a question of jurisdiction. It has given no decision in relation to the validity of the contract on which the suit is brought, nor the obligations it created, or the rights of parties under it. It has decided, merely, that it has no right under the laws of the state to try these questions, unless the bonds given by the state are filed. The plaintiff refused to file them pursuant to the order of the court, and the case was thereupon dismissed, for want of jurisdiction in the court to proceed further in the suit. There is evidently nothing in the decision, nor in the act of assembly under which it was made, which in any degree impairs the obligation of the contract, and nothing which will authorize this court to reverse the judgment of the state court."

In the case of Ex parte Alabama, 52 Ala. 231, 23 Am. Rep. 567, the supreme court of Alabama discussed the question (page 571 of Am. Rep., beginning at the bottom of the page): "All obligations or liabilities resting upon the state, being creations of the legislative power of the state, it is the good faith of the state alone on which reliance is placed to perform the obligation or discharge the liability. Legal remedies, or their efficacy in enforcing the obligation or liability, are not contemplated as in cases of contracts between individuals. These are vain and useless against the state without the concurrence of the legislative power. Statutes are often passed permitting suits against the state. Such statutes are matters of grace, confer privileges,—they do not create rights, and are always construed like other statutes, conferring privileges or exemptions on the citizen. The power to withdraw is commensurate with the power to confer, and when the privilege is withdrawn the citizen is remitted to the condition in which he stood when it was conferred. Many illustrations of the principle are given by Judge Cooley, in his work on Constitutional Limitations, and among others he mentions a statutory right to have cases reviewed on appeal which may be taken away by a repeal

of the statute, even as to causes which had been previously appealed. Cooley's Const. Lim. 382."

See, also, Memphis & C. R. Co. v. Tennessee, 101 U. S. 341, 25 L. Ed. 960, in which it was held that the right to sue which the state of Tennessee once gave its creditors, was not, in legal effect, a judicial remedy for the reinforcement of its contracts; and the obligations of its contracts were not impaired, within the meaning of the prohibitory clause of the constitution of the United States, by taking away what was thus given.

See, also, Baltzer v. North Carolina, 161 U. S. 240, 16 S. Ct. 500, 40 L. Ed. 684; Bank of Washington v. Arkansas, 20 How. 530, 15 L. Ed. 993.

It will thus be seen that the supreme court in former appeals was mistaken about the impairing of the obligations of contracts by repealing the act of 1871, and the act of 1876, by the act of 1884. (Laws 1884, ch. 174, p. 184). Neither of these acts gave a right to sue the state. Each of them gave the right to sue the levee commissioners under the first act, and the state auditor and treasurer under their bond by the second act.

At the time of repeal, and also at the time of the institution of this suit, there was no right to sue the state on any demand where the legislature had not made an appropriation, and given the auditor of public accounts authority to issue a warrant, and have the same paid out of the money so appropriated. Under the Revised Code of 1871, the state could be sued as an individual could be; but the state, during the existence of that statute, had not, in fact, assumed any liability, nor could any be implied on the state from the acts referred to in the former decisions. By chapter 1 of the Code of 1880 it is provided that the Revised Code should consist of the acts named in that chapter, among which is named, "An act in relation to suits against the state."

It was also provided in the said chapter in section 3, that "from and after the said first day of November, 1880, all acts and parts of acts, the subjects whereof are

revised, consolidated and reenacted in this Revised Code, or repugnant to the provisions contained therein, shall be, and the same are hereby repealed, subject, however, to any express regulations relating thereto, which may be contained in this code.''

There is nothing in the code specially contradictory to the act in relation to suits against the state.

Chapter 74, Revised Code of 1880, is the act in relation to suits against the state, and it is provided in section 2641 that ''any person having a claim against the state of Mississippi, after demand made of the auditor of public accounts therefor, and his refusal to issue a warrant on the treasurer in payment of such claim, may bring suit therefor against the state, in the court having jurisdiction of the subject-matter, which holds its sessions at the seat of government of said state; and, if there be no such court at the seat of government, such suit may be instituted in such court in the county in which the seat of government may be.''

This section has been carried forward in all of the subsequent codes in substantially identical language. It has been construed to mean that suits can be maintained against the state only upon claims which the auditor is empowered to audit. State v. Dinkins, 77 Miss. 874, 27 So. 832; Hall v. State, 79 Miss. 38, 29 So. 994; Gulf Export Co. v. State, 112 Miss. 452, 73 So. 281, in which it was held that the chancery court had no power to decree what the state should pay for the alleged breach of contract with reference to claims against the state which the auditor may not allow.

The Act of 1884, chapter 174, page 184, repealing the Laws of 1871 and 1876, recites: ''Whereas, The time fixed by law for the collection of the taxes assessed against the lands embraced· in the levee district known as District No. 1, has expired, and the further collection of said taxes has been suspended by the tax collectors in said District No. 1 in accordance with laws of the state of Mississippi,

creating said levee board of District No. 1, and the various officers thereof; and

"Whereas, The further existence of the said levee board of the state of Mississippi, District No. 1, as a body corporate, can be of no further good nor benefit, nor furnish further protection to the said lands embraced in said district;" therefore, the legislature enacted sections 1 and 2, providing for the repeal of the act, and dissolution of the powers and obligations conferred upon the officers therein contained.

In section 3 it was provided that the auditor of public accounts, as state auditor, may receive the bonds and coupons of said former levee district No. 1 in the redemption or purchase of lands heretofore sold, or for the payment of district No. 1 levee taxes, "to the extent that said levee taxes are now due and unpaid, for all years preceding, up to and including the year March 17, 1883."

The act so repealing does not prohibit the parties holding bonds or coupons unpaid, from purchasing lands with them which have been sold for the nonpayment of the taxes.

The Act of 1871, creating levee district No. 1, provides, in section 8, that for the purpose of building, repairing, constructing, and maintaining the levees and works mentioned in the act, and for carrying into effect the object and purposes of the act, that a uniform charge and assessment of two per cent per annum, "on the value of every acre of unimproved and improved land, and cultivated lands in said levee district, is hereby fixed, levied and made, which shall continue and be collected in each and every year for the period of twelve successive years from the date of this act, and shall be due and payable, annually, on or before the first day of September in each year for said period, and the valuation of every acre of unimproved land so taxed is hereby fixed for the purposes of this act at five dollars, except Sunflower and Tallahatchie counties, which shall be three dollars, and every acre of improved and cultivated land at thirty

dollars, except Sunflower and Tallahatchie counties, which shall be twenty dollars, and every acre of land improved and fenced, which shall not be cultivated at fifteen dollars, except Sunflower, and Tallahatchie counties, which shall be ten dollars per acre: Provided, That as soon as such unimproved lands shall have been improved, and said uncultivated lands shall have been put in cultivation in any year, the same shall be valued for the purposes of this act at thirty dollars per acre. The intention of this act in its exercise of the taxing power, being that every acre of land cultivated in any year during the period of taxation, shall be valued at the maximum assessment and made liable to taxation accordingly; and in all assessments made, the land described as cultivated shall be held to be such, when a crop shall have been pitched thereon, or the same shall have been used in anywise for production, or for any other use in the year, for which the assessment shall be made.''

It will be seen that this act fixes the fund from which the bondholder is to receive his money, and limits it to the period of twelve years, which had fully expired when the Act of 1884, repealing the law, was enacted. The bondholders had no right to payment except from funds collected, or due to be collected, within said period of time. By section 10 of the act it provides, among other things, ''And should any of the said charges and assessments not be collected as hereinbefore provided, then the holder of any bond or obligation of said board, which may be due and unpaid, may apply to the judge of the circuit court, or of the chancery court of any district included in the levee district, for a mandamus directed to said board, by which mandamus said board shall be ordered and compelled to proceed to have collected and paid over said charges and assessments, as herein provided, or instead of said mandamus, the said judges may, in their discretion, appoint one or more special commissioners, with authority to collect and pay over said charges and assessments, and for the collection of said

charges and assessments; the said commissioners, so appointed, shall have all the powers given by this act, and shall proceed in the same manner, as by this act prescribed, to the collectors of said board, for the enforcement and collection of the same; and such commissioners shall, before they act, give bonds in proper penalties, with good and sufficient securities, to be approved by said judge; and such commissioners shall be allowed for their services, when performed, a sum not exceeding one per cent on the amounts collected and duly paid over by them.''

It will be seen by this section that the bondholders are given a remedy to coerce the collection of the taxes provided in the act, for the payment of their bonds; and they might have resorted to that remedy to secure their funds, and their rights are measured by the said act. By the act and various provisions the officers charged with the duty of administering the act are made subject to suit. In other words, the statute prescribed ample protection for the bondholders, under that act.

No right, therefore, was impaired by the repealing act of 1884, above referred to. If the repealing act impaired these rights in a substantial way, so as to impair the enforcement thereof, the act as to them would have been void, but would not be void in other respects.

The Act of 1884 gave to them the rights to present their bonds, if they held any, to the treasurer and auditor in purchase of land, or in redemption of lands, and this was the only right that they then had. They could have proceeded against the auditor and treasurer under their bonds, under the law of 1876, for any default which impaired or injured their rights in any respect. The decision, therefore, in the former cases, holding the state as trustee, was erroneous, and should be overruled.

In chapter 108 of the Laws of 1876, page 174, appointing the auditor of public accounts and the state treasurer in the place of the former commissioners of levee board district No. 1, expressly provides that ''they shall be re-

sponsible on their official bonds for the safe-keeping and proper management of the levee funds of said district, and discharge all the duties of levee board, secretary and treasurer of same, and all laws and parts of laws touching the levee fund of District No. 1, the collecting and disbursement of the tax levied on account of said district, shall operate and be as binding upon them as upon the commissioners, secretary and treasurer of said district. It being the intent and purpose of this act to substitute the auditor of the state and the treasurer thereof, ex officio, as such commissioner, secretary and treasurer, in place and instead of the board of levee commissioners, secretary and treasurer of Levee District No. 1, now in office.''

The state, in this act was careful to protect the bondholders by rendering the auditor and treasurer, substituted as commissioners, liable upon their official bonds. The bonds and suit against said officers being specifically made a remedy, none other could be implied, and these officers were subject to suit on their bonds for any misconduct or mismanagement to the prejudice of the bondholders. It also provided that the sheriffs of the counties composing the district should be liable on their official bonds for any failure to collect the tax or account for the same according to law. Section 6, Laws 1876, p. 176.

But if I am wrong in the above views, still, the suit should be dismissed, because of the long delay and laches of the parties complainant. From a careful reading of the various acts, beginning in 1858, and another act in 1867, authorizing bonds to be issued for the construction of levees, and which provided that the lands sold for nonpayment of taxes to the levee commissioners should not be subject to taxation during the period in which they were so held. All of these acts gave remedies against the officers charged with their administration. The act of 1871 levied the taxes on the territory in the districts previously existing, and it does not except therefrom the lands therein sold for previous default of payment of

levee taxes; and as the same were not subject to taxation, and as this act of 1858 and that of 1867 were each passed at a time when it was permissible, under the constitution, for the state to surrender its taxing power in favor of the creditor, the legislature had no power to impose other taxes upon them, to the prejudice of the bondholders during a period when the lands were held by the levee commissioners.

In Gibbs v. Green, 54 Miss. 592, it was expressly so held. The court pointed out in that opinion that the creditors of the old levee district, under the act of 1858, and the act of 1867, could not be compelled by the legislature to surrender their rights and take the bonds of the new district. Inasmuch as it is not now possible to gather all the facts pertaining to the collection of taxes under all these schemes, the doctrine of laches should be applied and suit dismissed, because of the unfavorable position in which the parties defendant, including the state, are placed. The levee commissioners, under all the acts, were required to keep a record, and were directed specifically in many matters by the legislature. It would be impossible now to ascertain the facts and administer full justice, because parties who had knowledge of the facts have passed from this life, and their testimony is no longer available. Whether the various tax collectors and the various commissioners performed their duties cannot now be known with any degree of certainty. Had the complainants pursued their remedy timely by suits against the officers, all the facts could have been known, and full and adequate relief could have been granted to them to fully protect their rights, and, at the same time, not hurt or damage any of the defendants, whose rights have been made uncertain by the delay, and the conditions now existing less favorable to the ascertainment of truth than would have been the case, had the action been timely taken, should bar them of any rights now. It is the duty of a complainant or plaintiff in a lawsuit to prepare, with reasonable diligence, his cause for trial, and

press it. From the enactment of the laws of 1871 to this time, sixty-two years have passed. From the institution of this suit in 1888, to now, forty-five years have passed. It is unreasonable for a complainant to delay his cause for so long a time, even by the consent of the opposing party. This is especially true where the original defendants have died, and their legal representatives have been substituted. It is also especially true where the state is a party, for the state cannot be bound by the negligence or laches of its officials. This we have decided in many cases unnecessary to set forth here. Parties complainant must know, because it is the law, that an officer of the state cannot bind it by unreasonable and unnecessary delays.

In view of the criticism of the opinions applying the doctrine of laches to this suit, on the ground that the chancellor had not passed upon it, and that it was not raised by counsel, I desire to say that the case was appealed to settle the principles, which means all of the controlling principles arising on the record. We have the record before us, and it conclusively appears that laches exists. Counsel were given a chance to file briefs on that question, and have done so.

**Anderson, J.,** delivered an opinion dissenting in part.

There has been a great deal written about this case—probably too much. I feel constrained, however, to briefly state my conclusions without elaborating the reasons therefor.

I agree with the controlling opinion, written by Judge GRIFFITH, and the separate opinion, by Judge ETHERIDGE, that the decision of this case, as reported in 83 Miss. page 107, 35 So. 422, is unsound and ought to be overruled so far as the future is concerned. It is the law of the case, however, and must stand as such. I agree with the controlling opinion that the defendants whose names were not mentioned in the bill, and who, therefore, were not served with process, are not before the court, and therefore no valid decree can be rendered against them or

their lands. I concur in the controlling opinion for the reasons therein stated that the bill should be dismissed as to the Gibbs v. Green lands; and I concur with it that appellees are entitled to a decree against the state for twenty-one thousand eight hundred fifty-one dollars and seventy-three cents, representing the taxes collected by it on certain of these lands.

I disagree with the controlling opinion that appellees are barred by laches from recovering from the state the sums representing the taxes on the lands to which the state had title and sold without collecting the same. I agree with what Judge SMITH has written on this subject. I will only add this: I believe the rule is universal that appellate courts will not pass on any question not raised and passed on by the trial court, except the question of jurisdiction. All other questions, except that of jurisdiction, must have been decided by the trial court either expressly or by necessary implication. I am not willing to violate that rule in this case. That is what the majority opinion does; it amounts to the exercise of original jurisdiction by this court, which, under the constitution and laws of this state, the court does not possess.

I disagree with the opinions written by Judges GRIFFITH, ETHRIDGE, and SMITH that the state is not liable as trustee for the taxes it failed to collect on the lands it sold.

When this case was before the court, as reported in 77 Miss. 68, 25 So. 483, the court plainly decided, as it appears to me, that under both the Act of 1871 and the Act of 1876 the state held as trustee in possession, and was liable to the bondholders therefor, all lands acquired by it subject to these levee taxes. When the state disposed of these lands without collecting the taxes, it was guilty of a breach of trust and therefore liable to the bondholders for the taxes it should have collected. Undoubtedly that would be true of an individual trustee; I am unable to see why any different rule should be applied to the state. To hold that the state held these lands in

trust for the bondholders, but, nevertheless, was not liable for a breach of the trust simply means to hold in one breath that the state is trustee and in the next that it is not. As trustee the state was not acting in its governmental capacity, but in its private capacity. The authorities which hold that a state is not liable for the negligence or misfeasance of its officers or agents have no application. The authorities relied on by the state will be found collected in 25 R. C. L., page 407, section 43, where it is stated: "The rule is well established that a state is not liable for the negligence or misfeasance of its officers or agents, *except when such liability is voluntarily assumed by its legislature."* (Italics ours.)

The court held in this case in 77 Miss. 68, 25 So. 483, that by legislative enactment the state had become trustee of these lands for the bondholders. In so doing the state necessarily assumed liability for the negligence or misfeasance of its officers.

In my opinion the decree of the chancellor, in so far as the state is held liable for the taxes on these lands, ought to be affirmed.