STATE HIGHWAY COMMISSION *v.* COAHOMA COUNTY. *et al.*

(In Banc. November 10, 1947. Suggestion of Error Overruled October 25, 1948.)

[32 So. (2d) 555. No. 36585.]

[37 So. (2d) 287. No. 36585.]

632

Greek L. Rice, Attorney General, and Green & Green and E. R. Holmes, Jr., all of Jackson, and Reece O. Bickerstaff, of Gulfport, for appellant.

634

Watkins & Eager, **H. V. Watkins, Avery & Putnam, Jones & Ray,** and **Creekmore & Creekmore,** all of Jackson, **Bidwell Adam, George R. Smith, J. D. Arrington,** and **R. R. Buntin,** all of Gulfport, **Belk & Belk** and **Lester G. Fant,** all of Holly Springs, **Guy Mitchell, Sr. & Jr.,** of Tupelo, **George W. Currie,** of Hattiesburg, **Hiedleberg & Watts,** of Pascagoula, **Bob Smallwood, Jr.,** of Oxford, **Ray & Spivey,** of Canton, **Campbell & Campbell,** of Yazoo City, **D. W. Houston, Sr. & Jr.,** of Aberdeen, **V. B. Montgomery,** of Belzoni, **Hilton Waite,** of Leland, **Means Johnston,** of Greenwood, **Walter Gex Jr.,** of Bay St. Louis, **Carroll Kemp** and **Henley, Jones & Woodliff,** all of Hazlehurst, **Russell Wright, J. V. Gipson** and **Broach & Ethridge,** all of Meridian, **Roberson & Luckett,**

of Clarksdale, **Beard & Pack,** of Laurel, **Roach & Jones,** of McComb, **Owen Roberts,** of Brookhaven, **C. E. Johnson,** and **H. G. Stamper,** both of Union, **James A. Wiltshire,** of Magnolia, **Kermit Cofer,** of Water Valley, and **Evelyn C. Ortte,** of Marietta, Ga., for appellees.

640

642

**Griffith, J.**, delivered the opinion of the court.

Up to the time of the advent of the automobile as a practical means of conveyance all the roads in the state, outside of municipal streets, were of a primitive type, none of them being paved, except for some few yards here and there in swampy places where planked corduroys had been laid or sometimes but in rare instances a few yards of concrete were used. Along the coast there was a considerable mileage of shell roads but these were soon found to be wholly inadequate as against automobile travel.

The automobile had come into large use in the state by 1910, and there arose a demand in many parts of the state that more adequate roads be constructed or reconstructed. In that year Chapter 149, Laws 1910, was enacted authorizing the creation of road districts under the supervision of district commissioners after surveys by competent road engineers employed for that purpose, all to

be subject to the approval or disapproval of the board of supervisors of the respective counties.

Under this Act many road districts were created and the preliminary work was done by them which later led to the broader field of state highways. The Act of 1910 was soon followed by other district enactments some of which undertook to place jurisdiction over the roads and the construction thereof entirely in the hands of the district road commissioners, but these acts were declared unconstitutional in State ex. rel. v. Board of Supervisors, 111 Miss. 867, 72 So. 700, and Havens v. Hewes, 128 Miss. 650, 91 So. 397, on the ground that under Section 170, Constitution 1890, full jurisdiction over roads in the several countries was vested in the board of supervisors.

In 1916, fettered as it was by Section 170 of the Constitution, the legislature created by Chapter 168, Laws 1916, a state highway commission, which with the state highway engineer, to be appointed by the commission was to constitute the state highway department, the duties of which were ''to consider and adopt plans for laying out opening, altering and working roads and building highways,'' the chief purpose being to act as an intermediary as regards federal road funds. In 1920, by Chapter 203, Laws 1920, a state highway department was created with broader duties and powers among which was ''to co-operate with the boards of supervisors and district road commissioners, of the respective counties in the surveying, laying out and adoption of a state highway system.'' It was further provided that the powers of the state highway commission are advisory to the board of supervisors whom the commission may assist with its engineering force ''in establishing, locating, surveying and building roads, culverts, and bridges, in the system of state highways and inter-state roads  .  .  .  and it may pay part of the construction costs of such highways from its current funds and may assist in the building of said roads, culverts and bridges from any of its funds, either those derived from the state or national government.''

In this Act, chapter 203, Laws 1920, there was the beginning in point of actuality of the state highway system. At the same session a constitutional amendment was proposed to amend Section 170 of the Constitution so as to remove the jurisdiction of the boards of supervisors. This proposed amendment was too broad, and another was proposed at the session of 1922 which was adopted by the people and was inserted in the Constitution by Chapter 143, Laws 1924, whereupon Chapter 278, Laws 1924, was enacted, designating certain highways as state highways and placing them under the jurisdiction of the state highway department. All the highways concerned in the case now before us are within the designation mentioned.

There was no provision in the Act of 1924 for the construction or reconstruction of any of the highways by the state. It provided for maintenance only so far as the state was concerned. From 1924 to 1930 no important state highway statutes were enacted. What happened was that although there was general agreement that the state should pay the entire cost of the construction or reconstruction of the designated state highways, the type of pavement to be used became the subject of partisan political controversy so that it was not until 1930 that a comprehensive and adequate statute for the conversion of the state highway system into one of modern paved highways was enacted.

In that year by Chapter 47, Laws 1930, a comprehensive statute to the ends aforesaid, under the leadership of Horace Stansel, a member of the lower house who was a competent road engineer, was passed, now known as the Stansel Act. After designating the highways that were to be considered primary state highways, the Act, as a dominant expression of its purpose, declared that such primary highways "are hereby placed under the supervision and control of the State Highway Commission for construction, reconstruction and maintenance at the cost and expense of the state." As already stated,

there had never been any difference of opinion that the cost of the construction and reconstruction incident to the conversion of the old highways into modern paved highways should be at the cost and expense of the state, so far as the primary highway system was concerned.

But none of the previous enactments had placed any sufficient funds in the hands of the state highway department by which it could construct or reconstruct any of the roads in the state highway system. All that the department had was a portion of the gasoline taxes and of the road privilege taxes, sufficient for little more than the cost of maintenance. Nor did the Stansel Act provide any additional funds, the fact being that when the Stansel Act was passed in 1930 the profound depression that was soon to prostrate the finances of the state and entire country was plainly to be foreseen. It was not until 1936 that state funds for construction and reconstruction were provided.

It was foreseen or anticipated when the Stansel Act was passed that certain counties might be in a financial position, and would desire, to convert certain of its old roads in the primary system into modern paved highways before the time when the state could or would furnish the money so to do. Accordingly there was inserted in the Stansel the following section, now Section 5003, Code 1930, Section 8035, Code of 1942:

"Should any county desire to complete all or any part of the primary system of highways, as set out in this act, which lies in its borders at an earlier date than traffic demands and the regular order established hereunder would construct same, and if the revenues of such county from unpledged gasoline and motor vehicle privilege taxes are of such amount that half of such revenue will pay the interest and sinking fund of serial bonds needed for such construction, such bonds may be issued, as is now provided by law, for counties having 50,000 population, as general obligations of the county, and such gasoline or privilege taxes may be used to pay the interest and sink-

ing fund of same, or if the county shall desire to issue general obligations of such county to be retired by ad valorem levy according to general law, then the county may issue highway bonds for such purposes in the manner and method provided by law. The proceeds from such bonds shall be placed in a special fund for the purpose of paying the cost of construction of such portions of the primary system in such county, and such county may proceed to construct such highways in the manner prescribed by law. Such work shall be done, however, only with the permission and approval and under the supervision of the director, subject to the approval of the state highway commission, who shall decide the location, width of right-of-way and shoulders, type of paving, width and thickness of same, and the location, size, and construction of drainage openings.

"Whenever in the due course of the construction program of the state highway commission the time shall be reached when any paved highway or section thereof constructed under this provision would have been regularly constructed as a part of such program, and connection is made with such paved highway or section thereof, and same becomes a part of a continuous paved state highway, the commission shall cause the same to be appraised as provided in the section of this act providing for reimbursement of local units for pavement already constructed. The local unit shall thereupon be reimbursed in the amounts and according to the methods provided in that section."

At the time of the enactment of the Stansel Act a number of counties and road districts had already paved certain of their roads within the primary system either under the supervision of the state highway department and according to plans and specifications furnished by the department or under such plans and specifications and types of construction as to accord with the average of the modern paved highways constructed or reconstructed under the immediate direction of the state highway de-

partment. In order that the counties and districts which had so done should suffer no discrimination in the matter of costs and should be brought into equality with the majority of the counties which had done nothing towards modernizing their highways, the following additional section was inserted in the Stansel Act immediately following the section next heretofore mentioned, the section being Section 5004, Code 1930, Section 8036, Code 1942:

"Whenever in the due course of the construction program of the state highway commission the time shall be reached when any paved highway or section thereof heretofore built in whole or in part at local expense would have been regularly constructed as a part of such program, and connection is made with such paved highway and same becomes a part of a continuous paved state highway, the state highway commission shall cause to be appraised the pavement on said highway, or the portion or portions thereof that it is to be utilized as a part of the final location of the continuous completed paved state highway so connected. Such appraisal shall take into consideration the original cost of such pavement and the wear, depreciation and deterioration of same, and the state highway commission shall pay to the local unit at whose expense the road was constructed the proportionate part contributed or paid by said local unit represented in the then existing appraised value. Such payment may be made under such terms as may be agreed upon with the governing body of such local unit, but in no case shall reimbursement be made in less than ten nor more than twenty approximately equal annual payments. In the event highway bonds of such county or district are outstanding, the commission may pay to such local unit semiannually a sum sufficient to meet the payment of principal and interest due on the outstanding bonds, subject to the above limitation, until the total sum ascertained to be due shall have been paid. Should any surplus then remain, annual payments shall be made in sums amounting to not more than one-tenth of the total amount first as-

certained to be due and not less than one-twentieth of such amount, until the total sum found to be due shall have been paid. . . ."

In this section it will be noted that the appraisement there mentioned is "the pavement on said highway." The highway department takes the position that it is not authorized to appraise anything except the paving slab, and no bridges, while the counties contend that it embraces the entire roadbed, including rights of way and all bridges. Many authorities are cited by the counties wherein the term "pavement" as used in analogous statutes has been held to include not only the pavement slab, but everything necessary to support it, and that where a bridge is a necessary connecting link to make the pavement usable, the bridge is included. No authority in point is cited by the highway department to the effect that a pavement in such a statute means no more than the pavement slab. The numerous cases cited will appear in the reporter's abstracts of the briefs. The highway department argues that none of the cited cases deal with the precise language here—"pavement on said highway."

It was well said, we think, in Muff v. Cameron, 134 Mo. App. 607, 114 S. W. 1125, 1126, 117 S. W. 116, that the meaning of the term "pave" or "pavement" will depend upon where, and the connection in which, it may be used." In Hoefer v. City of Milwaukee, 155 Wis. 83, N. W. 1038, 1040, it was held that the word "pavement" includes all things necessary to make a level surface for horses and foot passengers of any convenient material "and all necessary excavation or filing to prepare the surface and the removal of obstacles as well as laying the paving stones or other surface material." If this were adopted, it would support the contention of the counties in their entirety.

We must look, however, to the entire statute, the whole of the Stansel Act, including previous legislation and all the surrounding circumstances, and above all to the domi-

nant purpose and intention of that Act. It is the firmly established rule in this state that in construing statutes, not only the language, but the purpose and policy which the legislature had in view must be considered, and the Court, in interpreting the statute, will give effect to such purpose and policy though the interpretation may go beyond the letter of the statute. Sheffield v. Reece, 201 Miss. 133, 28 So. (2d) 745, 749, citing Smith v. Chickasaw County, 156 Miss. 171, 179, 125 So. 96, 705; Zeigler v Zeigler, 174 Miss. 302, 310, 164 So. 768; Gandy v. Public Service Corp., 163 Miss. 187, 197, 140 So. 687. And, equally obligatory on the Court in construing such a statute is to interpret it, so far as practicable, so as to treat every county alike and to avoid discrimination and favoritism as between one another. Holland v. State, 151 Fla. 526, 10 So. (2d) 338. Cf. Quitman County v. Turner, 196 Miss. 746, 760, 18 So. (2d) 122. Indeed, the Court would have no jurisdiction to entertain the present cause under the doctrine of the prevention of a multiplicity of actions, except for the fact that in entertaining this combined suit, the court, in the interest of the public, is enabled to implement the maxim that Equality is equity.

We have already noted that the dominant purpose clearly expressed in the Stansel Act was that all these primary highways should be constructed and reconstructed into modern paved highways "at the cost and expense of the state." Manifestly, it was the purpose of the two quoted sections of the statute to arrange it so that every county would be treated alike with no discrimination for or against any county of the state in the matter of cost and expense.

Five counties took action under Section 8035. These were Coahoma, Jones, Lauderdale, Newton, and Leflore. Coahoma may be taken as typical. Coahoma raised and deposited $100,000 with the state treasurer to the credit of the state highway commission in April 1931 and a like sum in May 1932. The state highway department took this money and spent all of it in constructing and recon-

structing the primary state highways in Coahoma county, of which, however, only $94,385 went into the laying of the pavement slabs, and this is all that is to be appraised for reimbursement to Coahoma County as the highway department contends, which means that $105,615 of Coahoma County's money went into construction and reconstruction for which it is to get nothing back, and which means again that instead of the state paying all of the costs of constructing and reconstructing the primary state highways as was the express purpose of the Stansel Act, it would pay only a part of it in Coahoma County thus upsetting the obligatory requirement that all counties shall be treated alike without discrimination between them.

The Court is obliged to avoid any such discriminatory construction if any other reasonable interpretation is available, and we think there is. We think that the phrase "pavement on the highway" was a short-cut expression designed to exclude the interpretation as regards the constructing or reconstructing the old improved county highway into a modern paved highway, that anything of the old unpaved highway which was then there and which was used in the construction or reconstruction should be appraised. So, then, by the phrase "pavement on the highway" was meant to include whatever was necessary to put on the old unpaved highway in order to make it a modern paved highway—it meant that which was necessary to do in order to convert the old unpaved highway into a modern paved highway and to appraise on behalf of the county for such part as the county had in that conversion less the depreciation which had occurred from the time of the conversion until the converted paved highway became a part of the continuous state highway system. Any other interpretation would be to repudiate the dominant purpose expressly declared in the Stansel Act to convert the old county road system into a modern state highway system at the cost and expense of the state, and would work a gross discrimination

between the counties and in favor of those which had not put up a cent of their own funds in the conversion in their counties.

Our judgment is then that what was produced in that conversion by the $105,615, paid in by Coahoma County must be appraised as well as the $94,385 which went into the pavement slab and that the same formula is to be applied to Jones, Lauderdale, Newton, and Leflore, which means that bridges constructed or reconstructed in the conversion are not to be excluded. The appraisal date has been fixed by agreement as to the above counties, except Newton, and this Newton County date must be settled by the trial court.

We have assumed that the old highways in the foregoing five counties had previously been brought up to the standards presently to be mentioned and had been accepted by the highway department for maintenance, else the department would not have entered upon the work of their construction and reconstruction.

By Section 2, Chapter 278, Laws 1924, it was required that the counties through or into which ran the state highways designated in that chapter should each bring up the highway or highways within its borders to the standard which the state highway department was authorized to prescribe and that until this was done by the county, both as to roadway and bridges, the state highway department would not take over the highway in that county although designated as a state highway—another manifestation of the policy of equality of treatment pursued in all these statutes. The unpaved highways, including the bridges, thus brought up to standard and accepted for maintenance we will denominate as the old highways, the cost or value of which as they existed when taken over for maintenance is not to be included in any appraisement. This was what the counties and all of them equally had to put in as their part towards the modern program and to allow appraisement upon any other basis than as above stated would be to discriminate

against counties which had brought their roads up to standard but had done no paving.

But whatever was necessary or proper to put upon these old highways thus described in order to convert them into modern paved highways should be appraised less depreciation as has been outlined as regards the five counties heretofore mentioned. And if under the plans, specifications, and directions of the state highway department any segment or part of the old highway and the old bridges were abandoned and a new segment and new bridges were constructed at county expense, the new construction and the new bridges should be included in the appraisement. Also the cost of any new rights of way.

As to the old highways converted into modern paved highways before 1924 but after 1920, a more difficult problem is presented, for in such cases there were no highways which had been taken over as up to standard and accepted for maintenance by the highway department, the duty of maintenance previous to Chapter 278, Laws 1924, being upon the counties. There having been no accepted highways brought up to standard before 1924, we are without any certain basis for the calculation of what was necessary or proper to put upon the old highway to convert it into a modern paved highway.

Therefore, as to the highways mentioned in the next foregoing paragraph, it would seem that the only practicable course to pursue would be to appraise only the pavement slab plus the subgrade immediately supporting it where the old roadbed was used, but allowing the entire cost, less depreciation, where under the plans and specifications of the highway department a new roadbed, upon new rights of way and with new bridges, were constructed, abandoning for the new segment the previously existing roadway and bridges.

As to paved roads constructed before 1920, if any there were, a still further difficulty would be presented because these were paved as county highways, not as state highways, there being no state highways recognized as such

by legislation until the Act of 1920, and they were not paved under plans and directions of the state highway department. But we cannot tell with certainty whether in fact any claims presented here were for construction before 1920, and we therefore express no opinion as to that class, if there are any.

It is seen that as to the highways paved by the counties before 1930, there are three classes: (1) Those paved after 1924; (2) those paved between 1924 and 1920; and (3) those paved before 1920, if any there were of the latter. A considerable amount of labor has been performed by the attorneys or some of them in presenting data upon the three subjects. But in spite of this, the data as to some of the counties is imperfect or incomplete in the following particulars: As to some of the counties apparently in class (1), it is not shown when the highway was taken over for maintenance by the highway department and whether the entire work of conversion was done after that date. As to some counties it is not shown when the work for which appraisal is claimed was done and whether they fall in class (1) or in class (2) or in class (3), or whether partly in one class and partly in another. Other pertinent data necessary to apply what we have heretofore said in principle is missing, to the extent that no decree certain in all its parts could be rendered. This data should be presented on the hearing following the remand which we are ordering.

As to bridges in the foregoing classes (1) and (2): We have said in State ex rel. v. State Highway Commission, 195 Miss. 657, 682, 13 So. (2d) 614, 619, dealing with the bridge over the Bay of St. Louis between Hancock and Harrison Counties, which was built as an entirely new bridge by the two counties under Chapter 512, Loc. Laws 1924, that this was a necessary link in Highway 90, and that "but for its existence the Commission would have had to construct it in carrying out the mandate of the Legislature to take over, construct and maintain Highway 90 as a primary road across the State." The com-

mission now says there is no pavement on this bridge, and that inasmuch as the bridge constitutes a segment as to which there is no "pavement on the highway," the bridge is not to be included in the appraisement. We have already said that pavement on the highway includes whatever was necessary to put upon the old highway or upon any new segment constructed in lieu of one in the old highway, and in effect that whenever it was necessary in the conversion program to construct a new bridge or to take out an old one and build a new one in its place the new bridge in its entirety should be appraised, in the proportion that the county or counties contributed thereto, and we now add that it is immaterial whether the new bridge has a pavement slab on it or not. This then will include also the bridge over the Bay of Biloxi between Harrison and Jackson Counties, and the new bridge over the Yazoo River on Highway 49 in Leflore County, and the new bridge across the Tombigbee River in Monroe County, to mention only the more important ones.

We now add further that when any bridge in the old highway could be utilized in part in the program of conversion and was so utilized, only the part added thereto or the part put into the conversion should be appraised, and that when any bridge in the old highway is totally abandoned, or left to one side, it is not to be included in any appraisement, as, for instance, in the cases of the abandoned bridges in Yazoo County. And wherever any bridge whatever its modern qualities may be which has been constructed by the county but on a highway which has not yet become a continuous state highway, the appraisement of such a bridge must await until the statutory time for the appraisement has arrived.

Between and during the years 1924 and 1926, Hancock County furnished to the State Highway Department a sum in excess of $217,000, which was used by the department for the grading, drainage, bridges and gravel surfacing of several miles of new highway construction on State Highway 90-11 and 11 in that county, the route

therefor having been laid out and surveyed by the state highway commission itself on new ground as best we can make out from the agreed statement of the facts. But the laying of the pavement surface on the highway thus constructed was later done by the highway department, no part of the cost of the paving slab having been paid by Hancock County. The highway department now says that since the paving slab was not laid by Hancock County, none of the work preparatory thereto is subject to appraisement.

We have already said that "if under the plans, specifications and directions of the state highway department any segment or part of the old highway and the old bridges were abandoned and a new segment and new bridge were constructed at county expense, the new construction and the new bridges should be included in the appraisement." This is not to be avoided by taking the county's money to do everything on a new route except the laying of the pavement slab and merely because the county did not lay that slab then repay it nothing. This instance is enough within itself to demonstrate the unsoundness of the technical contention that in all cases nothing but the pavement slab should be appraised. What was done by the County on the segment or sections next above mentioned should be appraised except as to that part which is within the municipal limits of the City of Bay St. Louis.

We agree with the trial court that Section 4999, Code 1930, Section 8025, Code 1942, as to the use of material on which there is paid a royalty or patent right, has no application to such material used prior to the date of the passage of the Stansel Act.

Several municipalities have propounded claims for appraisement and reimbursements for streets constructed before 1930 at the expense of the municipalities and which streets by connection at the municipal limits are now utilized as a part of continuous state highways, and they point to the provision in Section 8036, Code 1942,

Section 14, Stansel Act, providing that "whenever in the due course of the construction program of the state highway commission the time shall be reached when any paved highway or section thereof heretofore built in whole or in part at local expense would have been regularly constructed as a part of such program, and connection is made with such paved highway," appraisement shall be made of said section so constructed at local expense and in favor of the local unit.

This sends us at once to see what the state highway commission was to do or could do within municipalities as a part of its regular construction program, and for this we find that the only authority in the Stansel Act given to the commission in that respect is in Section 15 of the Act, Section 8037, Code 1942, which empowers the commission to construct a state highway through any municipality of less than 2,500 in population, or along such portions of the streets of municipalities of more than 2,500 in population "where the houses average more than two hundred feet apart for a mile or a fraction thereof, beginning at the corporate limits." Compare Federal Highway Act and 23 U. S. C. A. Sec. 2.

It follows, therefore, that the Act did not authorize the highway commission to construct a highway through any municipality of 2,500 in population or more, with the exception as to sections therein wherein the houses average more than 200 feet apart—which municipalities we will class as Class A—and having no such authority such construction could not be a part of its regular construction program, and such municipalities are not within Sections 8035 or 8036.

What is to be done, then, with municipalities of less than 2,500 in population, or where they have constructed sections wherein the houses were more than 200 feet apart beginning from the municipal limits—and which we will class as Class B—when the work had been done thereon before 1930? They argue that it would unjustly discriminate against them were they denied appraisement and

reimbursement, when in such cases the highway commission would have had to do this work at state expense had the municipalities not done it. This at once presents the further question as to what is to be done with municipalities of the same class which have constructed paved streets since 1930 and which since the construction have been utilized by the highway commission as links in the state highway system. It is contended by the highway department that these latter are not within Section 8035, which provides reimbursement for sections or links constructed since 1930, for that section, upon a casual examination, would seem to provide for appraisement and reimbursement only to counties. If, then, appraisement is allowed to municipalities of the class now under consideration, that is Class B, for construction before 1930 and not to those who have done the same work since 1930, then a palpable discrimination and inequality would be worked against the latter municipalities. This discrimination and inequality could be avoided as between Class B municipalities by holding that municipalities are not included within Section 8036, Code 1942; that they are not local units as meant in that section, and that the section itself limited the local units to "county or district" units.

But there we are confronted with Section 2407, Code 1930, Section 3412, Code 1942, which makes each municipality a separate road district, so that we cannot read Class B municipalities out of Section 8036. And if nevertheless we were to say that none of the Class B municipalities is within either Section 8035 or Section 8036, the result would be that the municipalities of that class which have done this construction work would be discriminated against in favor of municipalities of the same class which did nothing but waited for the highway department to do it at state expense under Section 8037. No such an inequitable result could have been contemplated by the legislature. And we think the legislature did take care of the precise situation by the concluding

sentence of Section 13, Stansel Act, Section 8035, that sentence being: "The local unit shall thereupon be reimbursed in the amounts and according to the methods provided in that section," this reference being to the following section, Section 14, Stansel Act, Section 8036, Code 1942. If it had been the intention of the legislature to limit Section 8035 to counties only, the term used in the quoted concluding sentence would have been "counties" instead of "local units." We hold, therefore, that Class B municipalities are within both Sections 8035 and 8036.

As to municipalities in Class A, they are not included under the Federal Highway Act, 23 U. S. C. A. Sec. 2, in force since 1921. Municipalities of that class in constructing paved streets are justly considered as doing so primarily for municipal purposes and as a legitimate part of the municipal burden and obligation, not to be shared at state expense, it being sufficient from an equitable standpoint that the state will maintain such streets therein as are used as state highways, and this is done by Section 8056, Code 1942.

Finally, we must call attention to the fact that, in the main, the decree in this case is a mere statement of applicable principles but leaves them open to be applied accordingly as the facts may be worked out by the parties or as the parties may construe the facts. And now in attempting to review it we are referred to an enormous series of plats and drawings, with complicated figures on the numerous plats or drawings, and rarely have the briefs, in dealing with a particular county or local unit gone into the necessary detail to show exectly and what completely is the precise issue or issues and all the issues a to the particular county or unit. We call attention to Griffith Miss. Chanc. Prac., Sec. 625 et seq., and Todd v. Todd, 197 Miss. 819, 829, 20 So. (2d) 827, and compare Crawford v. State, 162 Miss. 158, 138 So. 589.

. We can see that this has been brought about by the fact that the larger issues with which we have hereinabove dealt drew the attention of the litigants to the exclusion

or partial exclusion of the subsidiary details. The latter, however, are not to be laid aside when they have an essential part in the requisite elements of a final decree. The Supreme Court has appellate jurisdiction only, and is not authorized to piece out a decree by making findings of facts. We have covered the general principles to be applied on a rehearing and we remand the cause that the trial court may make a decree which shall be complete, definite and certain as to each county and local unit in accordance with the principles hereinabove outlined; and if as to any point which may be supposed to have been covered in the decree but which is not also covered in the foregoing opinion, we state that we have not dealt with any such point and have made no adjudication on it.

Reversed and remanded.

**Smith, C. J.**, did not participate in this decision.

### DISSENTING OPINION.

**McGehee, J.**, delivered a specially concurring opinion.

I think that the main opinion herein is about as fair a plain for the reimbursement of local units as can be worked out as between the several counties and other local units that may be entitled to reimbursement for the cost of links or highway and bridges constructed at local expense, if an unjust discrimination between them is to be avoided.

My views on the subject, however, are expressed in a dissenting opinion rendered in the case of State Highway Comm. v. McGowan, Dist. Atty., ex rel. Hinds Co., 198 Miss. 853, 23 So. (2d) 893, 24 So. (2d) 330. But being now bound by the controlling opinion in the McGowan case, I am not justified in doing otherwise than to concur in the judgment of the Court which authorizes the appraisals to be made, although I am doubtful as to whether or not the two statutes involved are sufficiently clear in their language to create a cause of action in favor of

counties and other local units and to authorize the appraisal and compensation for all of the links of highway and bridges referred to in the main opinion herein. However, I must concede, as hereinbefore stated, that if the appraisals are not to be had and the compensation asked for is to be made, then that no fairer decision as to what shall be taken into consideration could be worked out than is therein set forth.

It has at all times been my judgment, however, that it was intended by these statutes that the appraisals should be made as of the time when the links of highway were taken over by the State Highway Commission as a part of a continuous and permanent paved highway; that it is impracticable to now make an intelligent appraisal of such links of highway after the lapse of these many years; and that the entire litigation is unfortunate in the light of the public welfare of the State, except as to the links of highway which were built at local expense with the approval of the Highway Commission under the inducement held out to local units by the provisions of the Stansel Act. I also think that the enormous cost that will be incident to making the appraisals and the compensation now being authorized will tend to greatly retard any farm-to-market highway program, if it does not result in the necessity of the Legislature having to withdraw from the counties their share of the gasoline funds in order to be able to defray the enormous expenditure that will be required for such reimbursement to local units, and that the undertaking will likewise result in a reduction of federal aid funds for road construction in this state. Then, too, it is to be remembered that the current gasoline funds are pledged each year in a sufficient amount to take care of the semi-annual installment on the sixty-million-dollar road bond issue, which are not being paid from year to year but are being refunded in order that the Highway Commission may use the current revenues from gas tax collections to maintain the present

system of highways, and to add any construction work that may be necessary.

Nevertheless, I must concur in the decision as to what is to be done, since I am bound by the decision in the Mc-Gowan case, and for the further reason that I think that the decision being rendered in the case at bar is fair and equitable if the appraisals are to be had and the reimbursements are to be made.

## DISSENTING OPINION.

**Roberds, J.,** delivered a dissenting opinion.

It appears to me necessary that I state my conclusions in a separate opinion. I do so in skeleton form.

The dividing line is 1930.

As to the roads in existence when Chapter 47, Laws 1930, Section 8036, Miss. Code 1942, was enacted:

*Pavement*:

The pavement upon such roads is to be paid for. This involves the nature of the paving and the elements to be appraised. As to the nature, it includes any material other than dirt, gravel or shell. The Commission itself recognized four kinds of paving. They are included. As to the elements to be appraised, this includes not only the driving slab but also all elements usually included in a contract for paving a road where the road-bed is already prepared. The Commission itself has a form of contract enumerating the elements covered by such contract. Those elements ought to be appraised. Of course, no element is to be appraised unless actually in existence at the time the appraisal should be made.

*Bridges*:

The Chancellor held that concrete bridges should be paid for. I agree with that. Where such bridges are mixed concrete and steel, or other material, it is a concrete bridge where concrete predominats in quantity or

cost. Such bridges should be paid for, if taken over and used by the Highway Department, even though there is no paving approaching the bridge from either end thereof. As to all bridges other than concrete, the driving slab thereon, if any, should be paid for, including pay for all elements usually included in a contract for paving the driving surface after the bridge has been constructed.

*Municipalities*:

Streets should be included, but to be uniform in dimensions with the approaching state highway.

*Warranite*: To be paid for.

Now, dealing with roads constructed after enactment of Chapter 47, Laws 1930, Section 8035, Miss. Code 1942:

Applies only to primary highways.

Municipalities not included.

The thing to be appraised under this section is the "paved highway"—not merely the pavement. This would include original value, less depreciation, of everything in existence when the appraisal is due to be made which was essential to the construction of the highway and which was paid for with money turned over to, or spent under the direction of, the Highway Commission, which of course, would include all bridges.

Of course the obligation to pay, in all instances, is only where connection is made with the unit for which payment is to be made "and same becomes a part of a continuous paved state highway," and when in the due course of the construction program of the State Highway Commission such unit would have been "regularly constructed as a part of such program."

ON SUGGESTION OF ERROR

**Smith, J.**, delivered the opinion of the court on suggestion of error.

The Court has carefully examined the suggestion of error in this case, and carefully considered each point and argument made therein. The majority of the Court is of the opinion that the suggestion of error should be overruled, and it is accordingly so ordered.

We add, by way of precaution and only because some question has been raised about it on the suggestion of error, that, although our former order was one of reversal and remand, the original opinion is to be regarded as the law of the case on any similar facts or issues upon a rehearing in the trial court. It is suggested that a careful consideration of the concluding two paragraphs of the opinion should remove any uncertainty as to the holding of this Court.

Suggestion of error overruled.

**Roberds, J.,** delivered a dissenting opinion.

On the merits I adhere to my separate opinion as it appears in the report of the case in 32 So. (2d) 555, which opinion, although designated a separate opinion, was in fact a dissent from the holding of the majority.

I do not think the action of the Legislature at its 1948 session was an adoption of the majority opinion, first, because Sections 8035 and 8036, Code 1942, were not reenacted but were merely permitted to remain as the law unchanged, and, second, because a suggestion of error was pending in this case and no final decision or judgment therein had been rendered.

**McGehee, J.,** delivered a dissenting opinion.

In the former opinion rendered herein on November 10, 1947, reported in 32 So. (2d) 555, the decree of the Chancery Court of Hinds County was reversed by a three to two decision here, owing to the absence and illness of the then Chief Justice. The views of Justice Roberds and the writer hereof, who were not in accord with the ma-

jority as to the proper construction of the statutes involved, were expressed in a separate and a specially concurring openion respectively. These two opinions would have been more appropriately designated if they had been rendered as dissents from the majority view, for the reason that they show that we were in accord in the main with the views of the chancellor to the effect that the statutes mean only what their language expressly declares.

The writer hereof, in specially concurring in the view that the counties were entitled to appraisement of the roads built at local expense, inadvertently assumed that he was bound by the decision in the case of State Highway Commission v. McGowan ex. rel., 198 Miss. 853, 23 So. (2d) 893, 24 So. (2d) 330, to such an extent that he would not be justified in dissenting from the majority opinion written in the present case, it now develops that in that case there was no issue as to what should be appraised other than the pavement on the highway, and in my opinion it is also now shown that this Court is without jurisdiction to entertain a suit against the State or its Highway Commission where an appropriation by the Legislature would be required to give any ultimate effect to its decision.

On the coming in of the Suggestion of Error herein, it became necessary for the Chief Justice, who had then resumed his duties, to take part in its consideration for the reason that his vote would have been controlling as to whether or not the chancellor should be affirmed if the other five judges should have adhered to their former views.

We therefore sent out a memorandum wherein we requested a response to the Suggestion of Error and for briefs on the question as to whether or not any suit could be maintained against the State in regard to the subject matter of this litigation. This question had not been theretofore raised by the Highway Commission, and consequently had not been previously briefed or specifically

dealt with in any of our decisions involving the alleged right of the counties to recover as a debt claimed to be owing to them from the State.

After a careful study of the prior decisions of the courts and the rules announced by the textwriters cited in the briefs of counsel, it is my humble judgment that the whole subject matter of this litigation should be left to the determination of the Legislature for an entire want of jurisdiction thereof by the courts; that in the absence of an express statutory consent from the Legislature no suit can be maintained either against the sovereign or one of its governmental agencies where the ultimate object and purpose of such suit is, as here, to compel the payment of a debt alleged to be due from the State, and which must be paid, if at all, by funds provided by the Legislature; and it will be found that no such statutory consent is given in Sections 13 and 14 of Chapter 47, Laws 1930, now Sections 5003 and 5004, Code of 1930, and Sections 8035 and 8036, Code 1942, known as the Stansel Act, or in any other statute, which would confer upon the twenty-three counties and the several municipalities the right to sue and compel an appraisal by the State Highway Commission of the links of ''pavement on'' highways built at local expense prior to 1930, and of certain ''paved highways'' built at local expense subsequent thereto.

The majority decision has held the above quoted words, in each instance, to mean also rights of way, road beds, gravel and dirt roads built at local expense, whether paved at local or state expense, and the bridges, culverts, drains, and ditches, road signs and guard rails thereon, where they have become a part of a continuous paved highway; and that the counties are entitled to compel an appraisement thereof with the view of having adjudicated the amount of the State's alleged liability therefor, as a debt due them by the State, upon a failure of the Commission to cause the same to be appraised and pay the appraised value thereof, aggregating the probable

sum of from $10,000,000 to $30,000,000—an estimate made in the briefs on behalf of the Highway Commission and not seriously challenged by opposing counsel—resulting in a probable loss of approximately $15,000,000 in Federal Aid Funds to the State, since the reimbursements claimed by the counties are to a great extent for funds already once matched by the United States for local Federal aid projects.

If such authority to sue is asserted by these political subdivisions of the State on the ground that we took jurisdiction of the previous suits of certain counties in that behalf in the cases of Hancock County v. State Highway Commission, 188 Miss. 158, 193 So. 808; Madison County v. Mississippi State Highway Commission, 191 Miss. 192, 198 So. 284; State ex rel. Cowan v. State Highway Commission, 195 Miss. 657, 13 So. (2d) 614; and State Highway Commission v. McGowan, 198 Miss. 853, 23 So. (2d) 893, 24 So. (2d) 330; it is upon the theory that this Court would have authority to destroy the State's immunity from suit, which the Legislature had not surrendered. The legislative department, instead of the judicial, has the sole power or jurisdiction to grant such consent to sue the State where an appropriation by the Legislature would be necessary to make such a suit effective.

Moreover, in the Hancock County case, supra, we merely held that the remedy sought therein by mandamus could not be maintained in the name of the county but could only be maintained for any purpose upon the relation of the Attorney General or a District Attorney, in any matter affecting the public interest.

In the Madison County case, supra, the Court withdrew a former opinion in order to pretermit any decision on the point now under consideration, since it had not been briefed and the suit there was for a mandatory injunction, and was not maintainable as such in any event; and it was there said [191 Miss. 192, 198 So. 286]: ". . . Assuming for the purpose of this decision, and for that

purpose alone, that the legislature . . . intended to create a liability and cause of action in favor of a local unit . . . the writ of mandamus (and not an injunction) is appropriately designed to afford the necessary remedy for that purpose." And we expressly said therein that "We pretermit the decision of any question pertaining to the right of appellant to any relief by appropriate proceedings in the premises . . ."

In the Cowan case the question of whether or not the State had given its consent to be sued in such a case was neither raised nor discussed.

Thereafter, the writer of the opinion in the Madison County case, supra, wrote a dissenting opinion in the case of State Highway Commission v. McGowan, supra, wherein attention was called to the fact that this Court had held in the case of State ex rel. Barron, District Attorney, v. Cole, Auditor, 81 Miss. 174, 32 So. 314, that no suit would lie to compel distribution to be made semiannually of the fund known as the "Chickasaw School Fund," etc., even though such distribution was expressly required by Section 212 of the State Constitution, the ground of the decision being that even though the State had sufficient money to pay the demand, a legislative appropriation would be necessary since the constitutional provision was not self-executing. The same is true as to the statute involved in the instant case, as will be hereinafter shown.

In the McGowan case the right to sue the State was not challenged by the Highway Commission, the question was not briefed, the majority opinion did not address itself to this specific question, and the same was raised only in the dissenting opinion by the writer of this one, after the majority of the Judges had already decided the case and determined to order the appraisal as prayed for.

It is the unchallenged right of the Court to raise the question, and if need be of its own motion, as to whether the State has given its consent to be sued in a particular case, and we should not allow a former mistake of our

own to prevent us from protecting this attribute of State sovereignty.

The provision of the Stansel Act which relates to the alleged duty of the Highway Commission to appraise and pay for such links of pavement on the highways is found in said Section 8036, Code 1942, wherein it is provided that: "Whenever in the due course of the construction program of the state highway commission the time shall be reached when any paved highway or section thereof heretofore built in whole or in part at local expense would have been regularly constructed as a part of such program, and connection is made with such paved highway and same becomes a part of a continuous paved state highway, the state highway commission shall cause to be appraised the pavement on said highway, or the portion or portions thereof that it is to be utilized as a part of the final location of the continuous completed paved state highway so connected. Such appraisal shall take into consideration the original cost of such pavement and the wear, depreciation and deterioration of same, and the state highway commission shall pay to the local unit at whose expense the road was constructed the proportionate part contributed or paid by said local unit represented in the then existing appraised value. . . ."

In the case of State Mineral Lease Commission v. Lawrence et al., 171 Miss. 442, 157 So. 897, 898, this Court, speaking through Justice Griffith, said: "There is no proposition of law which is better settled than the general rule that a sovereign state and its political subdivisions cannot be sued in the courts except upon the express statutory consent of that state. Numerous decisions of this court to that effect may be cited; but it is enough to note that this court, in banc in a recent case, State v. Woodruff [170 Miss. 744], 150 So. 760, has so held; and therein overruled a previous decision which had adjudicated that such consent could be worked out of a statute by implication, when express consent was absent from the terms of that statute."

The Court had said in the case of State v. Woodruff [170 Miss. 744, 150 So. 762], mentioned in the foregoing quotation, that: "We hold that the state cannot be made liable to suit out of implication gathered from a statute or any group of statutes, but the right to sue the state must be expressly granted by statute without which express grant no allowance to sue the state exists." The Woodruff case had been pending in the courts for more than forty years, affording ample time for this announcement of the law to represent the matured judgment of the Court in the premises. Moreover, this well-established principle was reaffirmed by this Court on May 24, 1948, in the case of State v. Sanders et al., 203 Miss. 475, 35 So. (2d) 529, wherein the Woodruff and Lease Commission cases were cited as announcing the true rule.

The opinion in State Mineral Lease Commission v. Lawrence, supra, proceeds to illustrate the instances wherein the rule does not apply when an agency of the State is sued and the relief demanded *requires no official affirmative action on the part of the State, nor the affirmative discharge of any obligation which belongs to the State in its political capacity*, and the opinion in that case clearly recognizes that where an appropriation or expenditure from the State would be required to carry out the ultimate decision of the Court, the suit will not lie without the express consent of the State.

In response to the memorandum sent out by the Court, the attorneys for the counties have quoted the said Section 8036, Code of 1942, as a part of the Stansel Act, but they fail to point out any provision therein, or in any other Statute, which either expressly or by necessary implication authorizes a suit to compel an appraisal of, or the payment for, the pavement on a highway, under said section, or any paved highway as a whole under Section 8035.

Moreover, they cite no case in point to show such consent, but discuss the case of State Mineral Lease Commission v. Lawrence, supra, which was a suit to restrain

members of the Lease Commission from invading the property rights and possession of the complainant, and wherein it was held that the Commission itself could not be sued for want of statutory authority. They cite also the case of United States v. Lee, 106 U. S. 196, 199, 1 S. Ct. 240, 27 L. Ed. 171, and Land v. Dollar, 330 U. S. 731, 67 S. Ct. 1009, 91 L. Ed. 1209, in the first of which cases the military authorities had seized the Robert E. Lee Estate, known as Arlington, and converted the property into a military station and a national cemetery. There the suit was brought by the owners to eject the military officers, and the Court held that the suit was maintainable as against the officers to eject them. It was not a suit against the Government or any agency thereof which would have required an appropriation or other expenditure by the United States to give effect to the judgment rendered, and hence the decision is not at all persuasive on the point now before us.

The alleged applicability of these cases is based on the contention of the counties that they are seeking to require "the individual members of the State Highway Commission to appraise the highways . . ." But, I am of the opinion that this position is not well taken. The statute does not provide for the appraisal to be made by the individual members of the Commission. The provision is that the Highway Commission *shall cause to be appraised.* The effort here is to compel the Commission as a governmental agency of the State to act as an entity in the premises in bringing about the appraisal demanded.

The cases of State Mineral Lease Commission v. Lawrence, and Land v. Dollar, supra, are in my judgment, unquestionably against the right to maintain the instant suit where the ultimate object and purpose is to enforce the payment of an alleged debt from the State to the counties from an appropriation to be made for that purpose, and appraisement is sought in order to be used for

influencing or coercing the Legislature into making such an appropriation.

In the case of Land v. Dollar, supra, [330 U. S. 731, 67 S. Ct. 1012] decided as recently as April 7, 1947, the Supreme Court of the United States said that "the rule is based on practical considerations reflected in the policy which forbids suits against the sovereign without its consent. The 'essential nature and effect of the proceeding' may be such as to make plain that the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration. . . . If so, the suit is one against the sovereign. Mine Safety Appliances Company v. Forrestal, supra, 326 U. S. [371], at page 374, [694], 66 S. Ct. [219], at page 221, [90 L. Ed. 140, 144.]" Can it be doubted that the cost alone of the appraisal of all the pavement, rights of way, road beds of both dirt and gravel, bridges, ditches, drains, road signs, guard rails and culverts, as required by the majority decision formerly rendered herein, would expend itself upon the public treasury, and interfere with the primary functions of the Highway Commission for a period of several months, if not from one to two years?

In the last above mentioned case, the Court said [326 U. S. 374, 66 S. Ct. 221] that the suit was in effect "an indirect effort to collect a debt allegedly owed by the government in a proceeding to which the government has not consented. The underlying basis for the relief asked is the alleged unconstitutionality of the Renegotiation Act and the sole purpose of the proceeding is to fix the government's and not the Secretary's (Forrestal) liability. Thus, though appellant denies it, the conclusion is inescapable that the suit is essentially one designed to reach money which the government owns. Under these circumstances the government is an indispensable party, [State of] Minnesota v. United States, 305 U. S. 382, 386 [388], 59 S. Ct. 292, 295, 83 L. Ed. 235 . . ."

On the other hand, ample authority is cited by the Highway Commission to sustain the proposition that this

Court is without jurisdiction to entertain the present suit. Among other cases, it relies upon the case of Woodruff v. State, hereinbefore first quoted from and discussed. Also, upon the general rule anounced in 49 Am. Jur. 304, Sec. 92, to the effect that "if the rights of the State would be directly and adversely affected by the judgment or the decree sought, the State is a necessary party-defendant, and if it cannot be made a party, that is, if it has not consented to be sued, the suit is not maintainable." One may not compel action by a governmental agency, where the ultimate effect would be to compel action by the State in its sovereign capacity.

It is true that there is a general statute providing for the State Highway Commission to sue and be sued, but in the case of State Highway Commission v. Gulley, 167 Miss. 631, 145 So. 351, 354, this Court said: "It is too well settled to require the citation of authority that the state highway commission, which is an agency of the state, is not subject to suit unless made so by statute, and that such statute, when one exists, is the measure of the power to sue such agency. A general statutory grant of authority to sue a governmental subdivision or agency does not create any liability, and suit may be maintained thereunder only for such liability as is authorized by statute, expressly or by necessary implication." The Stansel Act creates no enforceable liability or any cause of action in favor of the counties and other local units in event of a failure of the Commission to do what is therein provided for.

Being in derogation of sovereignty, the asserted right to sue under the terms of any statute must be strictly construed. Under the statutes here involved, if the local units are entitled to maintain a suit at all it would be for both an appraisal and payment, since the appraisal would be of no avail whatsoever unless the trial court should thereafter assess as a liability of the State the amounts due according thereto, and order the Commission to pay the same as a debt due by the State. It is evidently for

this purpose and upon that theory that this cause has been reversed and *remanded*. Otherwise, the Highway Commission should not be ordered to assume the almost intolerable burden at public expense of trying to ascertain the original cost to the local units from such records as may be available in the various counties and municipalities of the links of pavement on the highways and of the rights of way and everything located thereon, including the gravel roads, road beds, bridges, culverts, etc., built prior to the passage of the Stansel Act in 1930, and most of which information one would not expect to find on the records of the present Highway Commission except as to local Federal Aid projects alone; and for the further reason that such an undertaking would impose an intolerable burden upon the Commission, a task impossible of performance, and an expense upon the State that is incapable of estimation.

This litigation was begun by the filing of nine mandamus suits on behalf of as many counties in the name of the State, but on relation of district attorneys, to compel the State's own Highway Commission to appraise and pay for certain links of paved highway, all at the expense of the State, and now the counties involved make bold to assert that the State is suing them. This contention is based upon the fact that the Highway Commission brought the present suit in Chancery to enjoin the further prosecution of these mandamus suits, and many others then threatened and impending, in order that they could be defended in one court at the capital city so as to avoid the necessity of the Commission having to defend such a multiplicity of suits involving the same questions. Nor was the present suit in Chancery brought by the Attorney General. It was brought by the State Highway Commission in its own name, and the Attorney General had no choice except to comply with his statutory duty of representing the Highway Commission, as one of the State's governmental agencies in a matter of statewide interest. Therefore, the Attorney General has not

impleaded the State into this litigation so as to waive its immunity, and the Highway Commission could not have done so even if it had so desired.

I don't understand that it is seriously contended, if at all, that the Highway Commission was not entitled to enjoin the prosecution of the multiplicity of mandamus suits. However, our former opinion herein, which is being adhered to by the majority on this Suggestion of Error, reverses the action of the chancellor and remands the cause for further proceeding, instead of affirming him at least to the extent of his enjoining the further prosecution of the mandamus suits already pending at law, together with those threatened and impending by other counties, and also to the extent that he held that all of these counties were entitled to an appraisal of the "pavement on" the highway. Unless the chancellor was correct in enjoining the further prosecution of the mandamus suits, then they could be proceeded with in view of the reversal of the decree wherein they were enjoined.

· In 34 Am. Jur. 831, Section 37, it is stated: "It is a fundamental principle that courts will not employ their coercive process to compel the doing of a useless thing. Particularly is this true with respect to such a summary and expeditious process as mandamus. The writ is invariably withheld where it would be unavailing, nugatory or useless and its issuance an idle act." In support of this statement, decisions from the Supreme Court of the United States, and from approximately one-half of the state courts, are cited, including that of Wood v. State, 169 Miss. 790, 142 So. 747.

In the same text, Section 35, at Page 831, it is said: "Under the guise of enforcing a public right, the writ will not issue if in fact it will operate to the detriment rather than to the benefit of the general public, or cause great disorder and confusion in the fiscal affairs and duties of the officers of a public or quasi public corporation." The chancellor was manifestly correct in enjoining these suits, and in any event his action in so doing

should be affirmed. Otherwise he has no jurisdiction to proceed with the present suit upon the remand thereof, due to the pendency of the prior suits at law.

The same rule in reference to compelling the doing of a useless thing at needless public expense which prevails in regard to a proceeding by mandamus is equally applicable in the instant case where further prosecution of the mandamus suits have been enjoined by the trial court and they were there consolidated into one proceeding in equity to avoid their multiplicity, and where this Court is now asked to order an appraisal of the elements of a highway not provided for by the Legislature, thereby rendering it wholly improbable that an appropriation will ever be made to pay for as much as the "pavement on" the highways built at local expense prior to 1930 and the links of paved highway so built thereafter. In fact, the majority decision herein renders it unlikely that the Legislature will be able to make a satisfactory disposition of their legislative problem at all, even to the extent of paying the claims of the few counties that issued bonds for paved highways subsequent to, and under the inducements of, the Stansel Act, and which claims are meritorious to the extent of the paved highways built by the Highway Commission with the proceeds of such bonds issued pursuant to Section 8035, Code of 1942, here involved.

Fortunately, this Court is without power to require the Legislature to make the appropriation of many millions of dollars sought by the counties here involved, which would be needed to give effect to the majority decision herein; and with deference, I don't think that the Court should lend its coercive aid to their efforts to have adjudicated the amount of the State's alleged debt due them in each instance.

The present suit affords ample proof of the wisdom of Mr. Stansel, the other able members of his Legislative Highway Committee, and of the Legislature of 1930, in not incorporating in the Stansel Act an authority to sue the State in the event the Highway Commission should

fail to cause the appraisements to be made and pay for the "pavement on" the links of highway built prior to 1930 and the "paved highways" built thereafter. In fact, it is inconceivable to me that the Legislature of 1930, at a time when the counties were being so liberally dealt with, as they still are, in the division of gasoline funds and the allotment of license tag fees, and long before a single mile of paved highway had been built at State expense, intended to make possible the maintenance of litigation so inimical to the public welfare. The lawmakers are presumed to have known at that time that an enormous bond issue would be required for the construction of the contemplated State paved highway system, and that the same would have to be paid from the State's portion of gasoline funds, and it is not reasonable to suppose that they intended to open a "Pandora's Box" of lawsuits by waiving the State's immunity from suit under the Stansel Act.

And, if a district attorney, acting on behalf of a county as the real party in interest, though in the State's own name, or indeed if the Highway Commission itself, or any other agency of the State, can, by defending a multiplicity of suits, be held to have waived the State's immunity from suit, where an appropriation by the Legislature would be necessary to carry out the object and purpose of the litigation, then the settled law of this State to the effect that the consent of the sovereign to be sued must be expressly granted by statute is of no further avail. Moreover, I think it is no less the duty of the State Supreme Court than of the Highway Commission or the Attorney General to protect the immunity of the State from unauthorized litigation at public expense, and hence we have the well-established doctrine that the Court will of it's own motion raise the question of one's right to sue the State in the absence of an express statutory consent in that behalf.

Then too, the Highway Commission, through the Attorney General who was required by law to represent the

Commission, specifically alleged in its bill of complaint in the present suit that "Complainant avers that the question of the validity of its obligation to pay the defendants after appraisal made of any roads required to be appraised is not admitted by the filing of this suit and it avers that the State's credit should not be wrongfully pledged to defendants without express legislative authority, which complainant denies has been granted."

But, assuming for the sake of argument, and for that purpose alone, that the courts, instead of the Legislature, have the right to inform the Highway Commission as to what they should appraise and pay for under the Stansel Act as "pavement on" a highway built at local expense prior to 1930 and "paved highways" so built thereafter, I think, with the utmost deference to the majority view, that it has been conclusively demonstrated in the briefs submitted by the Highway Commission in behalf of the Suggestion of Error now under consideration that a far too liberal construction has been given in the former opinion of the Court herein to the term "pavement on" the highways when those words were construed in this case to mean and include the entire costs of rights of way in some instances, and the subgrade in other instances whether the highway was ever paved at local expense or not, and the grading of the road beds on which pavement was laid at local expense, gravel and dirt road beds, which were later paved by the Highway Department, and the bridges, culverts, ditches, drains, signboards and guard rails on such roads.

In the briefs above referred to, the report of the Stansel Committee to the Legislature has been extensively quoted from and shows that the words "pavement on" the highway in the Stansel Act, which are substituted for the words "high type surface" mentioned in the report, were used advisedly and meant only what those words ordinarily mean. This report discloses that the Stansel Act in the main is a paraphrased draft thereof, except that the observations made in the report to the Legisla-

ture places the meaning and intention of that body beyond question, and they show that Mr. Stansel, who was both a statesman and a civil engineer, as well as his able fellow-committeemen, knew what was intended to be recommended to the Legislature as to what should be appraised and paid for.

That report is somewhat lengthy, but it is couched in such plain language as to convey no hidden meaning. It clearly discloses that the majority opinion formerly rendered herein is at variance with the intention of these men who prepared, introduced, and conducted the handling of the Stansel Act in the Legislature as to what should be appraised and paid for on the highways built at local expense. It discloses that they took cognizance of the fact that the State was dealing generously with the counties in the division of gasoline taxes, and the allocation of license tag fees to them. The members of that recess Committee recognized in their report, which formed the basis of the adoption of the Stansel Act, that it would be necessary to continue the State's liberality in that behalf to the counties *because of the fact* that the counties had issued bonds to meet Federal aid, both for highways which had been graded, and those which had been graded and graveled, and in some instances paved, at local expense, before the passage of the said Act, and that it would be "an economic necessity that auto taxes be left with the counties to offset this tax burden." This has been accordingly done and the twenty year bonds issued prior to 1930 have of course been now fully retired from the counties' portion of such funds in many instances and almost fully paid in the remaining instances. In other words, the Legislature has not been derelict in its duty in not having made the appropriation now sought, and the counties have apparently been content until recently with the generous treatment accorded them, and with the Legislature's non-action in the premises.

The report estimated that the cost of high type pavement would be $22,000 per mile for the (concrete or other

hard surface) slab of high type pavement, and that there would be 2,300 miles thereof in the program at a cost of $50,600,000, and that there would be 2,850 miles of intermediate type paving estimated to cost $6,000 per mile to take care of generous gravel replacements and provide full width, or a total of $17,100,000. The report further estimated that the grading would cost $10,000 per mile for 2,060 miles of graded highway, or the sum of $20,-600,000. The report took notice of the fact that possibly half of the roads which would receive the high type pavement had already been constructed by the counties up to the required standards, and that this 2,060 miles of grading would therefore be adequate, the total estimate of the cost of contemplated being $88,304,504 for construction, $23,175,000 for maintenance, and $2,140,000 for administration costs, including estimated Federal aid on the then basis, or a total cost of the program in the sum of $113,619,405.

Had the legislature contemplated that the State would reimburse the counties for the expense of the grading and constructing of the graveled highways, and the dirt highways, ready for gravel, which were to be incorporated into the State system and thereafter paved, it would have been necessary to include in the contemplated expenditures an additional item of an amount equal to $10,000 per mile for the grading of the 3,090 miles of the total of 5,150 miles of contemplated paved highways, that is to say an additional item of $30,900,000, to say nothing of the cost of rights of way. The Legislature is presumed to have known that a contemplated $60,000,000 bond issue to be paid in semi-annual installments from the State's portion of current gasoline funds, together with the remainder thereof, would not have afforded the Highway Commission the funds with which to pay this $30,-900,000 item, plue the cost of many rights of way furnished by the counties, and which items had not been included in the estimate of $113,619,405.

Moreover, the report expressly states that "the Committee contemplates that rights of way now owned by the counties on roads take over by the State will be transferred to the State without cost to it." And, in my opinion, the report otherwise shows that the majority view is erroneous in assuming that the dominant purpose of the Stansel Act was that the entire cost of these primary highways was to be paid by the State. Such a purpose would have been to unjustly discriminate against the counties which were not on the primary system and had likewise built gravel roads, bridges, etc., at local expense.

Then too, in providing for an appraisal of the "pavement on" the highways, the Stansel Act itself declares that there should be taken into consideration the wear, depreciation and deterioration thereof. The Legislators are presumed to have known that rights of way, road beds on which pavement had been laid, unpaved road beds properly maintained, and galvanized or concrete culverts underneath the highways, etc., did not wear or deteriorate, and it is therefore evident that this provision was intended to apply only to the pavement on the highways, which had worn and deteriorated and were in need of patching and rebuilding at different places.

It is true that the words "to pave," where a governmental agency is authorized to pave a highway, implies that there shall be done whatever is necessary to prepare the road for pavement, but there is a vast difference between the meaning of these words and the meaning of the Legislature when it was determining what the State could financially afford to have appraised and paid for in regard to the links of paved highway already constructed.

Moreover, the majority view of the Court, as set forth in the former opinion herein, is that the Court, in construing a statute, should interpret it, insofar as practicable, so as to treat every county alike and to avoid discrimination as between one and another. This principle is necessarily departed from if those counties through which a primary and continuous paved highway was

finally built, are reimbursed for the cost to them of the gravel and dirt roads, etc , which were utilized for that purpose, when at least twice as much mileage of gravel roads was likewise constructed by other counties at local expense which have never been taken over and paved as a part of such primary system, and which are not therefore to participate in the millions of dollars involved in this litigation. If equality is to be the theme, then reimbursement only to the extent incurred by the extra cost incurred by the pavement on the primary system should be made, leaving the counties which were favored by having primary highways constructed through them to pay for their own gravel roads, rights of way, bridges, culverts, drains, etc., in the same manner as the other counties must pay for theirs under the decision herein. I do not think that the Legislature intended to thus discriminate against the less fortunate counties.

It required, of course, larger bond issues to grade, gravel *and pave* a link of highway than it did to merely grade and gravel those in other counties, and hence reimbursement for only the "pavement on" the highway would mean reimbursement to the county in which such a link was constructed to the extent of equalizing the burden among all of the counties of the State which issued bonds for gravel roads.

At any rate, I think that the Stansel Act plainly provides for the appraisal and payment of only the "pavement on" the highway as to links of pavement constructed prior to 1930 and for the "paved highways" constructed thereafter. But, if the language is conceived to be of doubtful meaning, then the report of the Stansel Committee clearly discloses that Mr. Stansel and his fellow-committeemen were recommending that the "high type surface" only should be appraised and paid for, and in lieu of these words there was substituted in the language of the final draft of the Act by the members of this Committee the words "pavement on" the highway, meaning the same thing. It seems to me that these words were

used for the very purpose of more clearly excluding rights of way, road beds, gravel and dirt surface highways, etc., instead of for the purpose of including them.

But, under the majority view, we are not entitled to consider this report in determining whether or not the construction of the statute as to the intention of the Legislature was correct in the former opinion herein reported in 32 So. (2d) 555. Yet, we find that thirty-one of the lawyers who are listed on page 557 of the reported case as representing the counties make the following statement in their joint brief, as to whether or not the Court may take judicial notice of the Stansel Committee report, a copy of which is now on file among the public records of the State Highway Department, the authenticity of which copy is unchallenged. These attorneys say: "We are of the opinion that Court may take judicial notice of reports of committees of the Legislature. See Witherspoon v. State ex. rel. West, 138 Miss. 310, 103 So. 134. There is little law on the subject. The Supreme Court of the U. S. has definitely decided that in constructing a statute the Court may consult the reports of committees having it in charge. McLean v. United States, 226 U. S. 374 [33 S. Ct. 122], 57 L. Ed. 260; Jett et al. v. Montague Mfg. Company, [61] App. D. C. [277], 61 F. 2d 918; Humphrey's Executor v. United States, 295 U. S. 602, [55 S. Ct. 869], 79 L. Ed. 1611."

They then proceed to cite other cases, including a number of decisions of our own Court, as supporting this view. Then the nine other lawyers, representing six of the counties, make the following concession, to-wit: "We will concede that this Court, in order to ascertain legislative intention is enacting a statute, the language of which is of doubtful or ambiguous import, may resort to committee reports and to the journals of the Legislature, showing the history in the Legislature of the Act in question while it was in the process of enactment. In fact, we have no objection to the Court resorting to any authentic source of information about the matter, and we waive

any technical objections we might have the right to advance thereto.''

Likewise, the Court is entitled to consult dictionaries for the meaning of words in a statute, geographies for the location of places in dispute, and encyclopedias for general information on a subject involved in a suit. By the same token, if the Judges find from a reading of the Book of Proverbs that their reasoning in an opinion is inaccurate or unsound, then they have the right to change their minds on Suggestion of Error.

To consider this committee report, as the most pertinent source of information available to ascertain what the Legislature intended when it said appraise the pavement on the highway, instead of saying the pavement and the remainder of the highway, is not to admit new evidence on Suggestion of Error. Since the majority opinion admittedly went beyond the language of the statute, the committee report merely reenforces the argument of the Highway Commission, and is a part thereof, to show that the Court had given the statute a far too liberal construction.

If the extensive quotations from the Stansel Committee report, which are set forth in the briefs of the Highway Commission on this Suggestion of Error, do not refute the correctness of the construction of the Stansel Act, as given in the former majority opinion, it could do no harm to the majority view for us to examine and consider such report. On the other hand, if it does show, as I think it unquestionably does, that we were in error in construing the statute, when we held that the requirement that the Highway Commission should cause to be appraised and pay for the ''pavement on the highway'' to mean not only the pavement but the right of way and everything else thereon, as hereinbefore mentioned, then we should hasten to correct our mistake, especially in a case where an erroneous construction is of such far-reaching consequences.

Moreover, the Highway Commissioners are men who are constantly in contact with road-builders in the examination and awarding of proposed contracts, etc., and are thoroughly familiar with what the term "pavement on" a highway means in road construction work. At any rate, if the Legislature had wanted the Commission to appraise and pay for the entire highways instead of the "pavement on the highway", it would be the province of the Legislature to have so informed the Commission by including these other elements in the provision of the Stansel Act in question. It has not seen fit for more than eighteen years to amend the statute so as to include, in addition to the pavement on the highways, the cost of the rights of way, gravel and dirt roads, etc., but has evidently assumed that the Highway Commissioners would be able to determine what was intended by pavement on the highway, if and when the Legislature should provide the necessary funds for the purpose of appraising and paying for the same; and, although there were members of the 1948 session of the Legislature who were likewise members of the session of 1930, and who were presumed to know, and did know, what was meant by the words "pavement on said highway" in the enactment of the Stansel Act, they did not propose any amendment thereto to conform to the construction of those words in the opinion rendered by the Court herein on November 10, 1947, although the Stansel Act was dealt with and amended otherwise in 1948 by repealing many sections thereof.

· The Legislature has, of course, been aware of the fact that no appraisements have been made pursuant to the Stansel Act of 1930, and has acquiesced in the failure of the Highway Commission to make them, and with full knowledge that the Highway Commission stood ready and willing to comply with the wishes of the Legislature at any time it should provide funds for the purpose of appraising and paying for the pavement on the highway. This litigation, however, tends to create the impression with the public that the Highway Commission

has willfully failed and refused to appraise and pay for such links of highway built prior to 1930, whereas the truth is that the gasoline funds have been irrevocably pledged for the payment of the $60,000,000 bond issue, several millions of which have had to be refunded instead of being paid for lack of sufficient funds for that purpose and for carrying on highway construction, or have been otherwise earmarked for the purpose of matching Federal Aid Funds for new construction, showing that the Commissioners have not been derelict in their duty in not having appraised and paid for such highways.

Finally, the majority view in favor of adhering to the former opinion is predicated on the further ground that since the Legislature of 1948 did not repeal the two sections of the Stansel Act here under consideration, the lawmakers are presumed to have adopted and approved the former opinion herein. It is true that there is a well-established rule to the effect that when the Legislature *reenacts* a statute, it is presumed to have adopted the construction previously given to it by the Courts. But that rule is not applicable here, first, for the reason that the Legislature did not reenact the statutes but merely permitted them to remain in the books, after they had been in non-use for nearly eighteen years, and had in fact become obsolete until they were sought to be brought into play by the recent suits. And second, the rule contended for does not apply to a decision that has not become final and is pending on Suggestion of Error.

The Legislature was presumed to know that the Court could of its own motion raise the question of jurisdiction to sue the State, and, as is stated in the brief on behalf of several of the counties in respect to the failure of the Legislature of 1948 to take action in the premises, it may have been because ''at that time the Suggestion of Error was pending and the Legislature doubtless considered that in passing upon the Suggestion of Error the Court might make some changes in its opinion, which the Court sometimes does.'' None of the lawyers representing the

counties are making the contention that the Suggestion of Error should be overruled on the ground that the questions presented herein have, because of a failure to repeal these code sections in 1948, become "moot"; and, with deference, I do not think that we should permit this highly technical theory to preclude us from correcting the too liberal construction given the statute in the former opinion herein, and at least without asking for briefs on this particular point. There is too much at stake in this litigation for this decision to become final without the State being given an opportunity to fully brief the question of whether or not a three to two decision of this Court, which was pending on Suggestion of Error, has been approved and adopted by the Legislature as a proper construction of a statute (where the other member of the Court had resumed his duties and was available during the Legislative session to participate in the consideration of a Suggestion of Error), by the mere failure of the Legislature to repeal the statute, and where there has been no affirmative action to reenact it, that is to say, where the Legislature merely pursued the same course which it had continued to pursue for eighteen years.

The Highway Commission has argued in its brief that the failure of the Legislature of 1948 to take action amounted to a repeal of the statute by implication. However, I do not think that there was an implied repeal. But the question raised by some of those concurring in the majority view of the Court that the case has become moot by failure of the Legislature to repeal the statute involved has not been contended for by any of the more than forty lawyers in the case representing the counties, nor has this precise question been briefed by anyone.

I am confident that no decision of this Court can be found to support the view that the failure of the Legislature to *take any action* at all, where there has been no reenactment of a statute, during the pendency of a Suggestion of Error has the effect of approving an original

opinion; and this is especially true where the opinion has been so recently rendered as not to permit the Legislature time to form any intelligent conception of how far-reaching it would be in its consequences.

The rejection by the Court of any consideration of the Stansel Committee Report to the Legislature, throwing light on the meaning of the Stansel Act, in the face of the concession by the attorneys for all of the interested parties that we have a right to consider it, and the over-ruling of the Suggestion of Error on the further, and I think untenable, ground that the question of whether the former opinion correctly interprets the statute under consideration has become a moot question, will inevitably result in less weight being given to the decision by the Legislature, when considering whether or not it will provide the millions of dollars necessary to make it effective, than a decision of the Court would otherwise be entitled to receive.

If the Stansel Committee Report had been before us on the original consideration of this appeal, without any valid objection by the attorneys to its competency, which they now admit, I would think it unjust to the majority of the Judges to assume that they would have nevertheless construed the words "pavement on the highway" to mean what they were construed to mean in the former opinion herein.

It was said on Suggestion of Error in the case of State Highway Commission v. McGowan, supra, [198 Miss. 853, 24 So. (2d) 331] wherein both an appraisal and payment was sought for only the pavement on the highways, that "we have allowed the mandamus to issue because the Commission has on hand the money for the appraisement (where only one county was involved) and which is at its command for that purpose; the order does not include payment of the appraised amount for the reason that the Commission does not have on hand or within prospect without legislative aid the sums needed to pay

the appraisement along with similar demands of other counties."

The Court recognized in that case that we had no authority to order payment for the pavement on the highways in Hinds County, for the reason that the Commission itself did not have the money to pay for the same, along with similar demands of other counties. And we of course have no authority to require an appropriation for that purpose. Here, the counties want the trial court, however, to adjudge the liability against the State for the amount of the appraised value in this same litigation, when the case is further heard on remand, after the appraisements shall have been made. And since the creation and distribution of the state highway fund, even for appraisement purposes, is a strict prerogative of the Legislature, we should not even order an appraisement, at such great expense to the State as would be entailed, where the same would avail nothing to the counties without an appropriation from the Legislature to pay the amount of such appraisement.

An intolerable burden would be cast upon the Highway Commission if they should undertake to appraise at this late day the gravel and dirt roads, rights of way, etc., on which the State later laid a pavement, and the links of pavement laid at local expense, including the remainder of the highway, as of the time when the connection was made with them as parts of a continuous paved highway. In fact, the requirement of this decision is now impossible of performance, due to the fact that some of the links of pavement, as along the Coast, are now imbedded in four lane highways and therefore wholly concealed; and it is inconceivable as to how a gravel or dirt road which is now covered by a concrete slab can be appraised either as of the time the connection was made and it became a part of a continuous paved highway or as of the time of the attempted appraisal, taking into consideration the wear, depreciation and deterioration thereof prior thereto.

The Legislature, if unhampered by this decision, and the Legislature alone, assuming a patriotic attitude toward the public welfare of the whole State, can work out a just solution and adjustment of this problem, taking into consideration to what extent it can afford to further impair the security of the holders of the unpaid portion of the $60,000,000 bonds (several million of which have not been paid, but refunded, as aforesaid); how much the State can afford to lose in Federal aid funds on account of part of the reimbursement to the counties; the extent to which it can afford to delay further pavement construction in the counties that have only one paved road each; then as to how long it should delay its farm-to-market road program while making a liberal division of gasoline funds with all the counties, including those now suing the State; whether or not it should raise the gasoline tax rate on all the people to fully satisfy the demands of the counties that instituted these suits, many of which have several paved roads built wholly at State expense far in excess of the amounts that will ever be spent in the less favored counties; and finally what consideration should be given by it to the "County Highway Aid Act," Chapter 187, Laws of 1946, dealing with the distribution of Federal aid and State appropriated funds as between counties according to area, population, etc.

Moreover, the Legislature is vested with authority to direct the Highway Commission to proceed with an appraisal of that which it is willing to appropriate funds to pay, the appraisal to be binding upon the counties, whereas in the courts the appraisals ordered would be subject to objections of each local unit when reported for approval, and this litigation would thereby be rendered interminable, with all fees and costs to be paid by funds raised by taxation.

In conclusion, the only justification that the writer offers for this lengthy dissent is a firm conviction of its correctness; and, although, as a member of the Legislature, I would vote for substantial relief to counties that

built, or furnished funds with which to build, paved highways after the passage of the Stansel Act in 1930, and to pay, at a fixed amount per mile according to the type of pavement and whether now embedded and concealed underneath other such surface or not, for the ''pavement on'' the highways built prior thereto at local expense, and to such an extent as would not work inequality among the counties interested or unjustly discriminate against all other counties, I am unable to concur in the view that it is a matter of any concern to the Court, or that we have correctly interpreted the statute involved.